## LEATHER MANUFACTURERS' BANK *v.* MORGAN & Others.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued November 3, 1885.—Decided March 1, 1886.

A depositor in a bank, who sends his pass-book to be written up and receives it back with entries of credits and debits and his paid checks as vouchers for the latter, is bound personally or by an authorized agent, and with due diligence, to examine the pass-book and vouchers, and to report to the bank, without unreasonable delay, any errors which may be discovered in them; and if he fails to do so, and if the bank is thereby misled to its pre-

judice, he cannot afterwards dispute the correctness of the balance shown by the pass-book.

If a depositor in a bank delegates to a clerk the examination of his written up pass-book and paid checks returned therewith as vouchers, without proper supervision of the clerk's conduct in the examination, he does not so discharge his duty to the bank as to protect himself from loss, if it turns out that without his knowledge the clerk committed forgery in raising the amounts of some of those checks, and thereby misled the bank to its prejudice, in spite of due care on the part of its officers.

In this case it was held that the question whether the depositor exercised in regard to such examination the degree of care required of him in the circumstances disclosed by the evidence, including the relations of the parties, and the established usages of business, and the question whether the endorsement of a particular check was, under the evidence, an endorsement in blank or one for deposit to the credit of the depositor, were for the jury to determine, under proper instructions as to the law.

This was an action commenced by defendants in error, as plaintiffs below, against the bank, to recover an alleged balance of account. The facts are thus stated by the court.

The defendants in error, subjects of the Queen of Great Britain, and partners under the name of Ashburner & Co., brought this action to recover a balance alleged to be due on a deposit account opened at the Leather Manufacturers' National Bank of New York City, in the name of "Wm. B. Cooper, Junior, agent for Ashburner & Co." The main dispute is as to the right of the depositor to question the account rendered by the bank, so far as it charges him with certain checks which he signed, but which, before payment, were materially altered by his clerk, without his knowledge or assent. The claim of the plaintiffs is, that, after deducting all payments to them, or for their use, there was due to them, April 8, 1881, the sum of $9,996.38, for which they ask judgment. They also ask judgment, upon a second cause of action, for the sum of $280.97, the amount of a check which, it is contended, was endorsed specifically for deposit to the credit of their agent, and was not placed to his credit. The bank denies its liability upon either cause of action, except for the sum of $141.91, which, it contends, is the entire balance due to the plaintiffs on March 22, 1881.

Numerous requests for instructions, in behalf of the bank, were denied; and, under the order of the court, the jury returned a verdict, upon which judgment was entered, in favor of the plaintiffs for the sum of $10,741.09. To this action of the court exception was duly taken, and the bank brings the case here for review.

The record contains a large amount of testimony, the details of which cannot well be embodied in this opinion; but the more important facts and circumstances which the evidence tended to establish, and upon which the decision of the case must turn, are those which will be now stated.

1. One Berlin entered the service of Cooper on the first day of January, 1878, when about seventeen years of age. He and his family were well known to his employer. From that date until March, 1881, as confidential clerk, he had the entire management of Cooper's office, kept his books, and had full charge of the account which Cooper, as agent of Ashburner & Co., kept with the defendant. With the knowledge and under the direction of Cooper he filled up all checks drawn upon that account, entering on the stub of the check-book the date and amount of each check, the name of the payee, and the purpose for which it was drawn. He states in his deposition that he was well known to the teller of the defendant bank, and as the representative of Mr. Cooper.

2. Pursuant to Cooper's instructions, or in the regular course of business, he filled up certain checks between September 11, 1880, and February 13, 1881, which, being signed by his employer and delivered to him, were altered by him before they were taken from the office. The alterations were by erasure and by re-writing the body of the checks, and were made, he states, "with great care, and could not be detected without very careful scrutiny, or a very close examination." The teller of the bank testifies that the checks when presented by Berlin were always carefully examined by him as to signature, amount, date, and indorsement, and that there was nothing about them to excite suspicion, or to suggest alteration or erasure. Upon the checks so altered, Berlin received from the bank the "full raised amount," out of which he paid to Cooper,

or to his use, the several amounts for which they were originally drawn, and appropriated the balance to the discharge of gambling debts which he had contracted.   The entries in the check-book were made by Berlin and were correct; but he "forced the footings of the stubs" by making false additions equal to the increase of the altered checks.

3. The numbers and dates of the altered checks and the nature of the several alterations are as follows:

| No. of Check. | Date of Check. | Character of Alteration. |
|---|---|---|
| 8356 | Sept. 11, 1880. | Check to cash or bearer, raised from $90 to $500. |
| 8377 | Sept. 28, 1880. | Check to cash or bearer, raised from $10 to $400. |
| 8424 | Oct. 30, 1880. | Check to cash or bearer, raised from $105 to $405. |
| 8431 | Nov'r 3, 1880. | Check to cash or bearer, raised from $17.25 to $600.25. |
| 8468 | Nov'r 26, 1880. | Check to cash or bearer, raised from $10 to $1.000. |
| 8480 | Dec. 10, 1880. | Check to order of Marston & Son, raised from $7.75 to $700.25, and the words "or bearer" written in after payee's name. |
| 8492 | Dec. 18, 1880. | Check to order of C. H. Clayton, raised from $15 to $1,500, and words "or bearer" written in after payee's name. |
| 8498 | Dec. 24, 1880. | Check to cash or bearer, raised from $80 to $600. |
| 8501 | Dec. 28, 1880. | Check to order of W. S. Daland, raised from $24.08 to $1,000, Daland's name erased, and that of Julius Brandies inserted, and words "or bearer" written in after payee's name. |
| 8504 | Dec. 31, 1880. | Check to cash or bearer, raised from $80 to $400. |
| 8508 | Jan'y 5, 1881. | Check to cash or bearer, raised from $10 to $2,000. |
| 8518 | Jany 14, 1881. | Check to order of Charles G. Hanks, raised from $33.60 to $1,100, words "or bearer (duty)" written in after payee's name, and "14th" erased and "27th" written over it. |
| 8550 | Feb'y 13, 1881. | Check to order of W. S. Daland, raised from $17.72 to $100.72, and words "or C. Clifford Berlin," written in after payee's name, and date changed to February "14." |

4. Cooper's pass-book was written up at the bank October 7, 1880, November 19, 1880, and January 18, 1881, and a balance struck, showing to his credit on those dates, respectively, $10,821.64, $4,568.68, and $5,566.61. Upon each occasion, the book was returned with all checks that had been paid subsequent to the previous balancing, including the altered checks. Across the face of the pass-book, on the first balancing, was

written ".62 vouchers returned"; on the second " 79 vouchers returned "; and on the last " 66 vouchers returned." Each time the pass-book was returned, with the vouchers, Berlin destroyed such of the checks in the lot as he had altered. He remembers to have shown the rest of the vouchers to Cooper on the balancing of October 7, 1880, but does not remember of pursuing that course on the other occasions.

5. Berlin states that Cooper "was in the habit of examining his check-book from time to time." It is clear that the latter knew of these balancings; for, he testifies that his account with the bank " was balanced from time to time, which was done by the bank writing up the pass-book, and returning the checks that had been paid by it; that when the pass-book was so returned it went to the clerk, Berlin, who then balanced the check-book, that being one of the duties imposed upon him; that the witness took no part in such balancings, but Berlin generally showed him the vouchers that were returned, because he used to like to look at them; but he never gave Berlin any particular instructions so to do. That he was in the habit of looking over his check-book and kept track of the balance, which, during the months of August, September, November and December, 1880, and January, 1881, he understood to be about $10,000; and that, when he asked Berlin as to the balance, his answer agreed with about what he supposed was in the bank." He also knew the object of such balancings; for he testifies "that he had been a dealer with the defendant bank for upwards of eighteen years, and that he knew that it was its custom, as well as the custom of all banks, to balance at intervals the pass-books of its depositors and to return the same when balanced, accompanied by the checks drawn by the depositor and charged to the account, as the vouchers of the bank for such payments."

6. Cooper states that the forgeries were discovered by him "about the first or second day of March, 1881." Berlin, having stayed away from the office for a day, he compared his pass-book with the stubs of the check-book, and ascertained that a certain number of checks, appearing on the stubs, were not charged against him in his pass-book, and did not appear

to have been returned by the bank; while others, which appeared on the pass-book to have been charged against and returned to him, did not appear, by the stub of the check-book, to have ever been drawn. He "thereupon sent his pass-book to the bank to be balanced, and it was balanced on March 2, 1881; and among the vouchers then returned were the aforesaid checks 8518 and 8550, which had been altered from their original amounts." This, he states, was the first knowledge he had of the forgeries. After receiving the last balancing, he "then notified the bank that his clerk had absconded, and that alterations had taken place, and requested them not to pay any more of his checks, the bodies of which were filled up in the handwriting of his clerk Berlin." Whether this notification was given as soon as he saw those two checks, or on the same day, or after the expiration of several days, the record does not show.

7. Cooper admits that, if on any of the several balancings, he had made such examinations of his check-book and pass-book as was done on March 1, 1881, he would have "easily discovered" that his account had been charged with altered checks; and that for the previous five or ten years he knew of various means adopted by bankers and merchants to prevent the raising or alteration of checks, but he had not employed or used any of them. Upon one occasion, the date not given, he discovered, by adding up the "footings of the check-book," an error, and spoke to Berlin about it. The latter having replied that it was very seldom he was caught in a mistake, Cooper believed him and looked no further into the matter.

Cooper did not surrender the altered checks, except 8518 and 8550, because they had been destroyed by his clerk. The teller states that the latter one came through the clearing-house, while the former was not, when paid, in the condition in which it appeared to be at the time of the trial. After the lapse of time and frequent handling, the alteration, he said, was now apparent.

It was upon this state of case, substantially, that the Circuit Court instructed the jury to find for the plaintiffs upon both causes of action.

Judgment was entered accordingly, and the bank sued out this writ of error to review it.

*Mr. Charles M. Da Costa* for plaintiff in error. *Mr. Noel B. Sanborn* was with him on the brief

*Mr. John M. Bowers* for defendant in error.

I. A bank paying a forged or altered check is liable to the depositor therefor for the full amount, if forged, and to the raised amount, if altered. The balancing of the depositor's account, and the rendition of the vouchers, including the altered ones, only make an account stated. The depositor is not bound personally to examine the same. If the examination be confided to a clerk, it is sufficient. If this clerk uses his position to perpetrate forgery, the loss is still on the bank. *Weisser* v. *Denison,* 10 N. Y. 68; *Welsh* v. *German American Bank,* 73 N. Y. 424; *Frank* v. *Chemical Bank,* 84 N. Y. 209; *Manufacturers' Bank* v. *Barnes,* 65 Ill. 69; *National Bank* v. *Tappan,* 6 Kansas, 456.

II. The only effect of an account stated is to cast the burden of proof upon the complaining party to show fraud, error or mistake. This is the doctrine of all the above cases, and of the following: *National Bank* v. *Whitman,* 94 U. S., 343, 346; *Manhattan Company* v. *Lydig,* 4 Johns., 377; *Phillips* v. *Belden,* 2 Edwds. Ch. 1; *Kinsman* v. *Barker,* 14 Ves., 579; *Bullock* v. *Boyd,* 2 Edwds. Ch. 293; *Barrow* v. *Rhinelander,* 1 Johns. Ch. 550. The same rule applies in law and equity. *Perkins* v. *Hart,* 11 Wheat. 237. And, after holding that after lapse of reasonable time an account rendered becomes admitted as correct, the court, in *Hardy* v. *Chesapeake Bank,* 51 Maryland, 562, says: "The presumption is liable to be repelled by showing that the error or fraud complained of was not discoverable by the exercise of reasonable care and diligence, or that there was no such appearance of things as to excite the suspicion of a reasonable man, or that, for any reason, the party had not had an opportunity to examine the account." p. 587. See also *Wiggins* v. *Burkham,* 10 Wall. 129, 132; *Hutchinson* v. *Market Bank,* 48 Barb. 302. Even the acknowledgment by

the depositor or maker that the forged signature is genuine does not cut him off from recovery, if such an acknowledgment be made after the bank has paid the money. *Hall* v. *Huse*, 10 Mass. 39; *Salem Bank* v. *Gloucester Bank*, 17 Mass. 1, 27.

III. A bank is liable to its depositor for any material alteration in a check drawn thereon. *Hall* v. *Fuller*, 5 B. & C., 750. Nor is the depositor bound to suspect that the person with whom he deals will commit forgery whenever the opportunity arises, and, therefore, it is not necessary for a person drawing a check to exclude the possibility of any addition or alteration. It is sufficient to fill in the ordinary way. *Société Générale* v. *Metropolitan Bank*, 27 Law Times, N. S., 849; *Manhattan Co.* v. *Lydig*, 4 Johns. 377; *Goddard* v. *Merchants' Bank*, 4 Coms. 147; *Bank of Commerce* v. *Union Bank*, 3 Coms. 230; *Bank of Albany* v. *Farmers' and Mechanics' Bank*, 10 Vt. 141; *Cases* collected in *Hardy* v. *Chesapeake Bank* above cited. The alteration of a check is the same thing as its forgery. *White* v. *Continental Bank*, 64 N. Y. 316; *Marine Bank* v. *City Bank*, 59 N. Y. 67. See also *Wood* v. *Steele*, 6 Wall. 80; *Oddie* v. *City Bank*, 45 N. Y. 735; and *Crawford* v. *West Side Bank*, decided in the Court of Appeals in New York in 1885, not yet reported; *Belknap* v. *National Bank*, 100 Mass. 376.

IV. The principal is only bound by his agent while acting in the course of an employment, affecting a third person. Agencies are of many kinds: from a general agency where the agent stands in the place of the principal, to that in which the most limited power is deputed for a specially defined purpose. A depositor in a bank could intrust to a confidential clerk as his agent the duty of examining his account, and if that clerk fraudulently performs the duty, the depositor was guilty of no negligence. For parallel cases see *Schmidt* v. *Blood*, 9 Wend. 268; *Warner* v. *Erie Railway Co.*, 39 N. Y. 468; *Wright* v. *New York Central Railroad Co.*, 25 N. Y. 562; *Hardy Brothers* v. *Chesapeake Bank* and *Weisser* v. *Denison* cited above. A man cannot be convicted of a crime because of his agent's knowledge being imputed to him. *The Queen* v. *Stephens*, L. R. 1 Q. B. 702; *Deerfield* v. *Delano*, 1 Pick. 465.

V. The only duty that the depositor owed was to acquaint the bank with the fact of the forgery as soon as he learned it. *White* v. *Continental Bank*, 64 N. Y. 316; *Corn Exchange Bank* v. *Nassau Bank*, 91 N. Y. 74.

VI. There is no estoppel. (a). Estoppel in pais can only avail where the position of the parties is changed. (b). Each forgery was an independent one. Each payment was a wrongful one on the part of the bank. They have no right to claim that they would have ceased doing wrong if the depositor had informed them of the wrongful acts of their clerks. (c). The plea cannot avail because there is no evidence to show that, had the bank had earlier knowledge, they could have recouped against the forger. *Ketchum* v. *Duncan*, 96 U. S. 659, 666; *Dezell* v. *Odell*, 3 Hill, 215, 222; *People* v. *Brown*, 67 Ill. 435; *Martin* v. *Zellerbach*, 38 Cal. 300, 315; *McKenzie* v. *British Linen Co.*, H. L. 44 Law Times, 431; *Continental Bank* v. *Bank of the Commonwealth*, 50 N. Y. 575; *Bank of Commerce* v. *Mechanics Banking Association*, 55 N. Y. 211; *White* v. *Continental Bank*, 64 N. Y. 316; *Knights* v. *Whiffen*, L. R. 5 Q. B. 660; *Hopkins* v. *Ware*, 38 Law Journal, Ex. 147.

VII. There was no negligence on the part of the depositor. The bank was guilty of gross negligence. The depositor's position has been fully stated under the fourth point. The position of the bank will be best seen by an examination of the two checks last paid by them, which were not destroyed by Berlin. The forgeries were palpable at sight. They have been in possession of counsel preparing this brief, since their return by the bank to Mr. Cooper, and we assert that there has been no change of any kind. The bank should be held liable for its gross negligence in paying checks where the alteration is so plain.

VIII. The defendant in error was entitled to a direction in his favor on his second cause of action. The endorsement is plain, and was a special endorsement, and reads, "For deposit in Leather Manufacturers' National Bank to the credit of W. B. Cooper, Jr., Agent for Ashburner & Co." The endorsement was restrictive. The bank could only make one use of the check, namely, credit the account of Ashburner & Co. with the

proceeds. *Lee* v. *Chillicothe Bank*, 1 Bond, 387; *First National Bank* v. *Reno County Bank*, 3 Fed. Rep. 257. With the endorsement in question on the check Berlin could make no use of it for his own benefit. The endorser could recover against any person who made or assisted Berlin to make any use of it except to credit the depositor's account. *Hook* v. *Pratt*, 78 N. Y. 371; *Claflin* v. *Wilson*, 51 Iowa, 15; *Sigourney* v. *Lloyd*, 8 B. & C. 622; *Treuttel* v. *Barandon*, 8 Taunt. 100; *White* v. *National Bank*, 102 U. S. 658; *Mechanics' Bank* v. *Valley Packing Co.*, 4 Missouri App. 200; 70 Missouri, 643.

IX. There being no conflict of evidence, and the evidence being of such a character as to compel the setting aside of a verdict in favor of the defendant, the court was bound to direct in favor of the plaintiff. Where the facts are clear, it is always a question exclusively for the court. Where the proofs are conflicting, the question is a mixed one of law and fact. In such cases the court should instruct the jury as to the law upon the several hypotheses of fact insisted upon by the parties. *Wiggins* v. *Burkham*, 10 Wall. 129, 132; *Toland* v. *Sprague*, 12 Pet. 300, 335; *Baylis* v. *Travelers' Ins. Co.*, 113 U. S. 316; *Randall* v. *Baltimore & Ohio Railroad Co.*, 109 U. S. 478; *Pleasants* v. *Fant*, 22 Wall. 116; *Anderson County Commissioners* v. *Beal*, 113 U. S. 227, 241. While it is true that the court did not make use of the expression that the direction was given because any verdict would have to be set aside yet such was the intent and fact. Negligence may be a question of fact or of law or both. What is due care is for the court. Whether that due care was exercised is for the jury. Smith's Leading Cases, note to *Coggs* v. *Bernard*, Vol. 1, pt. 1, p. 471, 8th ed.; *Rowland* v. *Jones*, 73 N. C. 52; *Poole* v. *Railroad Co.*, 56 Wisc. 227. That when on the most favorable construction of the facts the evidence is insufficient to sustain a finding of negligence it becomes the duty of the court to direct that there is no negligence as matter of law; see *Randall* v. *Baltimore & Ohio Railroad Co.*, 109 U. S. 478, 482.

MR. JUSTICE HARLAN delivered the opinion of the court. After stating the facts as above reported, he continued:

The court' below, as shown by its opinion, proceeded upon the ground that Cooper was under no duty whatever to the bank to examine his pass-book and the vouchers returned with it, in order to ascertain whether his account was correctly kept. For this reason, it is contended, the bank, even if without fault itself, has no legal cause of complaint, although it may · have been misled to its prejudice by· the failure of the depositor to give timely notice of the fact—which, by ordinary diligence, he might have discovered on the occasion of the several balancings of the account—that the checks in question had been fraudulently altered. This view of his obligations does not seem to the court to be consistent with the relations of the parties, or with principles of justice.

While it is true that the relation of a bank and its depositor is one simply of debtor and creditor, (*Phœnix Bank* v. *Risley*, 111 U. S. 125, 127,) and that the depositor is not chargeable with any payments except such as are made in conformity with his orders, it is within common knowledge that the object of a pass-book is to inform ·the depositor from time to time of the condition of his account as it appears upon the books of ·the bank. It not only enables him to discover errors to his prejudice, but supplies evidence in his favor in the event of litigation or dispute with the bank. In this way it operates to protect him against the carelessness or fraud of the bank. The sending of his pass-book to be written up and returned with the vouchers, is, therefore, in effect, a demand to know what the bank claims to be the state of his account. And the return of the book, with the vouchers, is the answer to that demand, and, in effect, imports a request by the bank that the depositor will, in proper time, examine the account so rendered, and either sanction or repudiate it. In *Devaynes* v. *Noble*, 1 Meriv. 530, 535, it appeared that the course of dealing between banker and customer, in London, was the subject of inquiry in the High· Court of Chancery as early as 1815. The report of the master stated, among other things, that for the purpose .of, having the pass-book " made up by the bankers from their own books of account, the customer returns it to them from time to time as he thinks fit; and, the proper entries being made by them up to

the day on which it is left for that purpose, they deliver it again to the customer, who thereupon examines it, and if there appears any error or omission, brings or sends it back to be rectified ; or, if not, his silence is regarded as an admission that the entries are correct." This report is quite as applicable to the existing usages of this country as it was to the usages of business in London at the time it was made. The depositor cannot, therefore, without injustice to the bank, omit all examination of his account, when thus rendered at his request. His failure to make it or to have it made, within a reasonable time after opportunity given for that purpose, is inconsistent with the object for which he obtains and uses a pass-book. It was observed in *First National Bank* v. *Whitman*, 94 U. S. 343, 346—although the observation was not, perhaps, necessary in the decision of the case—that the ordinary writing up of a bank book, with a return of vouchers or statement of accounts, precludes no one from ascertaining the truth and claiming its benefit. Such undoubtedly is a correct statement of a general rule. It was made in a case where the account included a check in respect to which it was subsequently discovered that the name of the payee had been forged. But it did not appear that either the bank or the drawer of the check was guilty of negligence. The drawer was not presumed to know the signature of the payee ; his examination of the account would not necessarily have disclosed the forgery of the payee's name ; therefore his failure to discover that fact sooner than he did was not to be attributed to want of care. Without impugning the general rule that an account rendered which has become an account stated, is open to correction for mistake or fraud, *Perkins* v. *Hart*, 11 Wheat. 237, 256; *Wiggins* v. *Burkham*, 10 Wall. 129, 132, other principles come into operation, where a party to a stated account, who is under a duty, from the usages of business or otherwise, to examine it within a reasonable time after having an opportunity to do so, and give timely notice of his objections thereto, neglects altogether to make such examination himself, or to have it made, in good faith, by another for him ; by reason of which negligence, the other party, relying upon the account as having been acquiesced in or approved,

has failed to take steps for his protection which he could and would have taken had such notice been given. In other words, parties to a stated account may be estopped by their conduct from questioning its conclusiveness.

The doctrine of estoppel by conduct has been applied under a great diversity of circumstances. In the consideration of the question before us aid will be derived from an examination of some of the cases in which it has been defined and applied. In *Morgan* v. *Railroad Company*, 96 U. S. 716, 720, it was held that a party may not deny a state of things which by his culpable silence or misrepresentations he has led another to believe existed, if the latter has acted upon that belief. "The doctrine," the court said, "always presupposes error on one side and fault or fraud upon the other, and some defect of which it would be inequitable for the party against whom the doctrine is asserted to take advantage." In *Continental Bank* v. *Bank of the Commonwealth*, 50 N. Y. 575, 583, it was held not to be always necessary to such an estoppel that there should be an intention, upon the part of the person making a declaration or doing an act, to mislead the one who is induced to rely upon it. "Indeed," said Folger, J., "it would limit the rule much within the reason of it if it were restricted to cases where there was an element of fraudulent purpose. In very many of the cases in which the rule has been applied, there was no more than negligence on the part of him who was estopped. And it has long been held that where it is a breach of good faith to allow the truth to be shown, there an admission will estop. *Gaylord* v. *Van Loan*, 15 Wend. 308." The general doctrine, with proper limitations, was well expressed in *Freeman* v. *Cooke*, 2 Exch. 654, 663, and in *Carr* v. *London & Northwestern Railway Co.*, L. R., 10 C. P. 307. In the first of those cases it was said by Parke, B., for the whole court, that "if, whatever a man's real intention may be, he so conducts himself that a reasonable man would take the representation to be true, and believe that it was meant that he should act upon it, and did act upon it as true, the party making the representation would be equally precluded from contesting its truth; and conduct, by negligence or omission, when there is a duty cast

upon a person by usage of trade or otherwise to disclose the truth, may often have the same effect." And in the other case, Brett, J., speaking for the court, said: "If in the transaction itself which is in dispute, one has led another into the belief of a certain state of facts by conduct of culpable negligence calculated to have that result; and such culpable negligence has been the proximate cause of leading and has led the other to act by mistake upon such belief, to his prejudice, the second cannot be heard afterwards, as against the first, to show that the state of facts referred to did not exist." See also *Manufacturers' & Traders' Bank* v. *Hazard*, 30 N. Y. 226, 229; *Blair* v. *Wait*, 69 N. Y. 113, 116; *McKenzie* v. *British Linen Co.*, 6 App. Cas. 82, 101; *Miles* v. *McIlwraith*, 8 App. Cas. 120, 133; *Cornish* v. *Abington*, 4 H. & N. 549, 556.

Upon this doctrine, substantially, rests the decision in *Bank of United States* v. *Bank of Georgia*, 10 Wheat. 333, 343; where the question was as to the right of the Bank of Georgia to cancel a credit given to the Bank of the United States, in the general account the latter kept with the former, for the face value of certain bank notes purporting to be genuine notes of the Bank of Georgia, and which came to the hands of the other bank in the regular course of business and for value. The notes were received by the Bank of Georgia as genuine, but being discovered nineteen days thereafter to be counterfeits, they were tendered back to the Bank of the United States, which refused to receive them. This court held that the loss must fall upon the Bank of Georgia. Mr. Justice Story, who delivered the opinion of the court, after observing that the notes were received and adopted by the Bank of Georgia as its genuine notes, and treated as cash, and that the bank must be presumed to use all reasonable care, by private marks and otherwise, to secure itself against forgeries and impositions, said: "Under such circumstances, the receipt by a bank of forged notes, purporting to be its own, must be deemed an adoption of them. It has the means of knowing if they are genuine; if these means are not employed, it is certainly evidence of a neglect of that duty which the public have a right to require. And in respect to persons equally inno-

cent, where one is bound to know and act upon his knowledge, and the other has no means of knowledge, there seems to be no reason for burdening the latter with any loss in exoneration of the former. There is nothing unconscientious in retaining the sum received from the bank, in payment of such notes, which its own acts have deliberately assumed to be genuine. If this doctrine be applicable to ordinary cases, it must apply with greater strength to cases where the forgery has not been detected until after a considerable lapse of time." "Even," he added, "in relation to forged bills of third persons received in payment of a debt, there has been a qualification engrafted on the general doctrine, that the notice and return must be within a reasonable time; and any neglect will absolve the payer from responsibility." It was, therefore, held that, as the Bank of Georgia could by ordinary circumspection have detected the fraud, it must account to its depositor according to the entry made in its books at the time of receiving the notes.

The same principle was recognized in *Cooke* v. *United States*, 91 U. S. 389, 396. One of the questions there was as to the effect, on the rights of the government, of the receipt by an assistant treasurer of the United States in New York of certain treasury notes, endorsed by the holders to the order of the Secretary of the Treasury for redemption in accordance with an act of Congress, and which notes, when examined at the Treasury Department, were ascertained to be forgeries, of which prompt notice was given. This court, speaking by the Chief Justice, said: "It is undoubtedly, also, true, as a general rule of commercial law, that where one accepts forged paper purporting to be his own, and pays it to a holder for value, he cannot recall the payment. The operative fact in this rule is the acceptance, or more properly, perhaps, the adoption of the paper as genuine by its apparent maker. . . . He must repudiate as soon as he *ought* to have discovered the forgery, otherwise he will be regarded as accepting the paper. Unnecessary delay under such circumstances is unreasonable; and unreasonable delay is negligence, which throws the burden of the loss upon him who is guilty of it, rather than upon one who is not." Again: "When, therefore, a party is entitled to

something more than a mere inspection of the paper before he can be required to pass finally upon its character—as, for example, an examination of accounts or records kept by him for the purpose of verification—negligence sufficient to charge him with a loss cannot be claimed until this examination ought to have been completed. If, in the ordinary course of business, this might have been done before payment, it ought to have been, and payment without it will have the effect of an acceptance and adoption. . . . What is reasonable must in every case depend upon circumstances; but, until a reasonable time has in fact elapsed, the law will not impute negligence on account of delay."

This court in the two cases last cited, refers, with approval, to *Gloucester Bank* v. *Salem Bank*, 17 Mass. 33, 42. In that case it appeared that the Salem Bank exchanged with the Gloucester Bank, for value, certain bank notes which purported to be, and which both banks at the time believed to be, the genuine notes of the Gloucester Bank, and which the latter bank did not, until about fifty days after the exchange, discover to be forgeries. The question was whether the Salem Bank was bound to account for the value of the notes so ascertained to be counterfeit. Chief Justice Parker, speaking for the whole court, observed that the parties being equally innocent and ignorant, the loss should remain where the chance of business had placed it, and that in all such cases the just and sound principle of decision was, that, if the loss can be traced to the fault or negligence of either party, it should be fixed upon him. He said: "And the true rule is that the party receiving such notes must examine them as soon as he has opportunity, and return them immediately. If he does not, he is negligent; and negligence will defeat his right of action. This principle will apply in all cases where forged notes have been received; but certainly with more strength when the party receiving them is the one purporting to be bound to pay. For he knows better than any other, whether they are his notes or not; and if he pays them, or receives them in payment, and continues silent, after he has had sufficient opportunity to examine them, he should be considered as having adopted them as his own."

These cases are referred to for the purpose of showing some of the circumstances under which the courts, to promote the ends of justice, have sustained the general principle that, where a duty is cast upon a person, by the usages of business or otherwise, to disclose the truth—which he has the means, by ordinary diligence, of ascertaining—and he neglects or omits to discharge that duty, whereby another is misled in the very transaction to which the duty relates, he will not be permitted, to the injury of the one misled, to question the construction rationally placed by the latter upon his conduct. This principle commends itself to our judgment as both just and beneficent; for, as observed by the Supreme Court of Ohio in *Ellis & Morton* v. *Ohio Life Ins. & Trust Co.*, 4 Ohio St. 628, 667, while in the forum of conscience there may be a wide difference between intentional injuries and those arising from negligence, yet no man conducts himself "quite as absolutely in this world as though he was the only man in it; and the very existence of society depends upon compelling every one to pay a proper regard to the rights and interests of others. The law, therefore, proceeding upon the soundest principles of morality and public policy, has adapted a large number of its rules and remedies to the enforcement of this duty. In almost every department of active life rights are in this manner daily lost and acquired, and we know of no reason for making the commercial classes an exception."

Recurring to the facts of this case, there was evidence tending to show—we do not say beyond controversy—that Cooper failed to exercise that degree of care which, under all the circumstances, it was his duty to do; he knew of the custom of the defendant to balance the pass-books of its depositors and return their checks "as vouchers" for payments; yet he did not examine his pass-book and vouchers to see whether there were any errors in the account to his prejudice, and, therefore, he could give no notice of any. Of course, if the defendant's officers, before paying the altered checks, could by proper care and skill have detected the forgeries, then it cannot receive a credit for the amount of those checks, even if the depositor omitted all examination of his account. But if by such care

and skill they could not have discovered the forgeries, then the only person unconnected with the forgeries who had the means of detecting them was Cooper himself. He admits that by such an examination as that of March, 1881, he could easily have discovered them on the balancings of October 7, 1880, November 19, 1880, and January 18, 1881. If he had discovered that altered checks were embraced in the account, and failed to give due notice thereof to the bank, it could not be doubted that he would have been estopped to dispute the genuineness of the checks in the form in which they were paid; upon the principle stated by Lord Campbell in *Cairncross v. Lorimer*, 3 Macq. 827, 830, that "if a party having an interest to prevent an act being done, has full notice of its having been done, and acquiesces in it, so as to induce a reasonable belief that he consents to it, and the position of others is altered by their giving credit to his sincerity, he has no more right to challenge the act to their prejudice than he would have had if it had been done by his previous license." This, however, could not be, if, as claimed, the depositor was under no obligation whatever to the bank to examine the account rendered at his instance, and notify it of errors therein in order that it might correct them, and, if necessary, take steps for its protection by compelling restitution by the forger. But if the evidence showed that the depositor intentionally remained silent, after discovering the forgeries in question, would the law conclusively presume that he had acquiesced in the account as rendered, and infer previous authority in the clerk to make the checks, and yet forbid the application of the same principle where the depositor was guilty of neglect of duty in failing to do that, in reference to the account, which he admits would have readily disclosed the same fraud? It seems to the court that the simple statement of this proposition suggests a negative answer to it.

There was, also, evidence tending to prove—we do not say conclusively—that the depositor gave, practically, no attention to the account rendered by the bank, except to that one rendered March 2, 1881; that very slight diligence would have disclosed the fact that the vouchers, which he knew to be in

the possession of his clerk, were not all that the account upon its face showed had been returned; and that he intrusted the entire business to an inexperienced boy, in whose integrity he seemed to place implicit confidence, and of whose conduct he neglected to exercise that supervision which ordinary prudence suggested as both necessary and proper. Upon one occasion, as we have seen, he discovered an error in the footings of the check-book, and failed to look farther, because of the assurance of his clerk that he was seldom caught in a mistake. He was in the habit of looking over his check-book and keeping track of his balance in bank, and yet he did not observe that he was improperly charged in the balancing of October 7, 1880, with checks for $500 and $400; in that of November 19, 1880, with checks for $405 and $600.25 ; and in that of January 18, 1881, with checks for $1,000, $700.25, $1,500, $600, $1,000, $400, and $2,000. He finally discovered, in March, 1881, that there was something radically wrong in his account, and sent his pass-book to the bank to be balanced, without intimating, so far as the record shows, that he had then discovered anything to excite suspicion or to call for explanation. The book having been balanced and returned to him on March 2, 1881, he then notified the bank that his clerk had absconded, and forbade the payment of any more checks the bodies of which were in Berlin's handwriting. Whether the clerk had absconded and left the State prior to this sending of the pass-book to the bank does not appear. But, when next heard of, so far as the record shows, he was at Wilmington, Delaware, in June, 1881, when and where he gave his deposition, *de bene esse*, in behalf of his former principal. The numerous checks which he confesses to have forged have been destroyed, and the bank is thereby put at disadvantage upon any issue as to the fact of forgery, or as to whether the checks may not have been so carelessly executed at the time they were signed by the depositor, as to have invited or given opportunity for these alterations by his confidential clerk. *Van Duzen* v. *Howe*, 21 N. Y. 531, 538; *Redlich* v. *Doll*, 54 N. Y. 234, 238; *Young* v. *Grote*, 4 Bing. 253; *Greenfield Savings Bank* v. *Stowell*, 123 Mass. 196, 202. Still further, if the depositor was guilty of

negligence in not discovering and giving notice of the fraud of his clerk, then the bank was thereby prejudiced, because it was prevented from taking steps, by the arrest of the criminal, or by an attachment of his property, or other form of proceeding, to compel restitution. It is not necessary that it should be made to appear, by evidence, that benefit would certainly have accrued to the bank from an attempt to secure payment from the criminal. Whether the depositor is to be held as having ratified what his clerk did, or to have adopted the checks paid by the bank and charged to him, cannot be made, in this action, to depend upon a calculation whether the criminal had at the time the forgeries were committed, or subsequently, property sufficient to meet the demands of the bank. An inquiry as to the damages in money actually sustained by the bank by reason of the neglect of the depositor to give notice of the forgeries might be proper if this were an action by it to recover damages for a violation of his duty. But it is a suit by the depositor, in effect to falsify a stated account, to the injury of the bank, whose defence is that the depositor has, by his conduct, ratified or adopted the payment of the altered checks, and thereby induced it to forbear taking steps for its protection against the person committing the forgeries. As the right to seek and compel restoration and payment from the person committing the forgeries was, in itself, a valuable one, it is sufficient if it appears that the bank, by reason of the negligence of the depositor, was prevented from promptly, and, it may be, effectively, exercising it. *Continental Bank* v. *Bank of the Commonwealth,* above cited; *Voorhis* v. *Olmstead,* 66 N. Y. 113, 118; *Knights* v. *Wiffen,* L. R. 5 Q. B. 660; *Casco Bank* v. *Keene,* 53 Maine 103; *Fall River Bank* v. *Buffinton,* 97 Mass. 498.

It seems to us that if the case had been submitted to the jury, and they had found such negligence upon the part of the depositor as precluded him from disputing the correctness of the account rendered by the bank, the verdict could not have been set aside as wholly unsupported by the evidence. In their relations with depositors, banks are held, as they ought to be, to rigid responsibility. But the principles governing those relations ought not to be so extended as to invite or encourage

such negligence by depositors in the examination of their bank accounts, as is inconsistent with the relations of the parties or with those established rules and usages, sanctioned by business men of ordinary prudence and sagacity, which are or ought to be known to depositors.

We must not be understood as holding that the examination by the depositor of his account must be so close and thorough as to exclude the possibility of any error whatever being overlooked by him. Nor do we mean to hold that the depositor is wanting in proper care, when he imposes upon some competent person the duty of making that examination and of giving timely notice to the bank of objections to the account. If the examination is made by such an agent or clerk in good faith and with ordinary diligence, and due notice given of any error in the account, the depositor discharges his duty to the bank. But when, as in this case, the agent commits the forgeries which misled the bank and injured the depositor, and, therefore, has an interest in concealing the facts, the principal occupies no better position than he would have done had no one been designated by him to make the required examination—without, at least, showing that he exercised reasonable diligence in supervising the conduct of the agent while the latter was discharging the trust committed to him. In the absence of such supervision, the mere designation of an agent to discharge a duty resting primarily upon the principal, cannot be deemed the equivalent of performance by the latter. While no rule can be laid down that will cover every transaction between a bank and its depositor, it is sufficient to say that the latter's duty is discharged when he exercises such diligence as is required by the circumstances of the particular case, including the relations of the parties, and the established or known usages of banking business.

It was insisted in argument that the grounds upon which the Circuit Court proceeded are sustained by the settled course of decision in the highest court of New York, as manifested in *Weisser* v. *Denison*, 10 N. Y. 68, 70; *Welsh* v. *German-American Bank*, 73 N. Y. 424; and *Frank* v. *Chemical Bank*, 84 N. Y. 209, 213. We are also referred to *Manufacturers' Bank* v.

*Barnes,* 65 Ill. 69, and *National Bank* v. *Tappan,* 6 Kansas, 456, 467. There are, it must be conceded, some expressions in the first two cases which, at first glance, seem to justify the position of counsel. But it is to be observed, in reference to the case of *Weisser* v. *Denison,* that it is said in the opinion of the court that, as the bank had not taken any action, nor lost any rights, in consequence of the silence of the depositor, the only effect of such silence was to cast the burden upon him to show fraud, error, or mistake in the account rendered by the bank. From *Welsh* v. *German-American Bank,* it is clear that the comparison by the depositor of his check-book with his pass-book would not necessarily have disclosed the fraud of his clerk; for the check when paid by the bank was, in respect of date, amount, and name of payee, as the depositor intended it to be, and the fraud was in the subsequent forgery by the clerk of the payee's name. As the depositor was not presumed to know, and as it did not appear that he in fact knew, the signature of the payee, it could not be said that he was guilty of negligence in not discovering, upon receiving his pass-book, the fact that his clerk, or some one else, had forged the payee's name in the endorsement.

The latest expression of the views of the Court of Appeals of New York is in *Frank* v. *Chemical National Bank.* From what is there said it is evident that that learned tribunal does not give its sanction to the broad proposition that a depositor who obtains periodical statements of his account, with the vouchers, is under no duty whatever to the bank to examine them, and give notice, within a reasonable time, of errors discovered therein. The court in that case, speaking by Judge Andrews, who delivered the opinion in *Welsh* v. *German-American Bank,* refers to *Weisser* v. *Denison.* After observing that it was unnecessary to restate the grounds of that decision, and adverting to the argument that where a pass-book was kept, which was balanced from time to time and returned to the depositor, with the vouchers for the charges made by the bank, including forged checks, the latter is under a duty to the bank to examine the account and vouchers, with a view to ascertain whether the account is correct, he proceeds: "It does

not seem to be unreasonable, in view of the course of business and the custom of banks to surrender their vouchers on the periodical writing up of the accounts of depositors, to exact from the latter some attention to the account when it is made up, or to hold that the negligent omission of all examination may, when injury has resulted to the bank, which it would not have suffered if such examination had been made and the bank had received timely notice of objections, preclude the depositor from afterwards questioning its correctness.   But where forged checks have been paid and charged in the account and returned to the depositor, he is under no duty to the bank to so conduct the examination that it will necessarily lead to the discovery of the fraud.   If he examines the vouchers personally, and is himself deceived by the skilful character of the forgery, his omission to discover it will not shift upon him the loss which, in the first instance, is the loss of the bank.   Banks are bound to know the signatures of their customers, and they pay checks purporting to be drawn by them at their peril.   If the bank pays forged checks it commits the first fault.   It cannot visit the consequences upon the innocent depositor who, after the fact, is also deceived by the simulated paper.   So, if the depositor, in the ordinary course of business, commits the examination of the bank account and vouchers to clerks or agents, and they fail to discover checks which are forged, the duty of the depositor to the bank is discharged, although the principal, if he had made the examination personally, would have detected them.   The alleged duty, at most, only requires the depositor to use ordinary care; and if this is exercised, whether by himself or his agents, the bank cannot justly complain, although the forgeries are not discovered until it is too late to retrieve its position or make reclamation from the forger."

In *Manufacturers' National Bank* v. *Barnes*, the Supreme Court of Illinois, while expressing its approval of the decision in *Weisser* v. *Denison*, shows that the bank was itself guilty of negligence in paying checks drawn by the depositor's clerk; for it had in its possession, placed there by the depositor, written evidence that the authority of the clerk to draw checks against the depositor's account was restricted to a designated period,

which had expired when the checks there in dispute were paid. Nor does the case cited from the Supreme Court of Kansas militate against the views we have expressed, although it refers with approval to *Weisser* v. *Denison.* The question there was as to the right of the bank to charge the depositor with the amount of a certain forged acceptance. The court found that the depositors were not guilty of neglect, and gave notice of the forgery as soon as it was discovered.

An instructive case is that of *Dana* v. *Bank of the Republic,* 132 Mass. 156, 158, where the issue was between a bank and its depositor in reference to a check, which the latter's clerk altered after it had been signed and before it was paid by the bank. The court said that the plaintiffs, who were the depositors, owed to the bank "the duty of exercising due diligence to give it information that the payment was unauthorized; and this included not only due diligence in giving notice after knowledge of the forgery, but also due diligence in discovering it. If the plaintiffs knew of the mistake, or if they had that notice of it which consists in the knowledge of facts which, by the exercise of due care and diligence, will disclose it, they failed in their duty; and adoption of the check and ratification of the payment will be implied. They cannot now require the defendant to correct a mistake to its injury from which it might have protected itself but for the negligence of the plaintiffs. Whether the plaintiffs were required, in the exercise of due diligence, to read the monthly statements or to examine the checks, and how careful an examination they were bound to make, and what inferences are to be drawn, depend upon the nature and course of dealing between the parties, and the particular circumstances under which the statements and checks were delivered to them." So in *Hardy* v. *Chesapeake Bank,* 51 Maryland, 562, 591, which was also a case where checks forged by the confidential clerk of the depositor had been paid by the bank, and, as shown by the pass-book, were charged to his account, the court, upon an elaborate review of the authorities, said, upon the general question, that "there is a duty owing from the customer to the bank to act with that ordinary diligence and care that prudent business men gen-

erally bestow on such cases, in the examination and comparison of the debits and credits contained in this bank or passbook, in order to detect any errors or mistakes therein. More than this, under ordinary circumstances, could not be required."

What has been said applies mainly to the issue between the parties in relation to the altered checks embraced in the balancings of October and November 1880, and January 1881. The case in reference to checks 8518 and 8550 presents a somewhat different aspect. Cooper, we infer from the evidence, became aware, on March 2, 1881, when these checks were returned with his pass-book, balanced as of that date, that they were forgeries. But it is not clear from the evidence at what time, or on what day, he gave the bank notice of that fact, or generally of the fact that there had been alterations in his checks. It may be that the account rendered on March 2, 1881, did not, by reason of any unnecessary delay, become an account stated, as to items subsequent to the balancing of January 18, 1881, and, consequently, there may be no ground to charge the depositor with negligence in not giving due notice to the bank of the alleged alterations of those two checks.

It remains only to consider the action of the court below in reference to the second cause of action. Touching this branch of the case the essential facts are: Cooper, on August 25, 1880, in his capacity as "Agent for Ashburner & Co.," made his check upon the Leather Manufacturers' National Bank for $280.97, payable to the order of "W. B. Cooper, Jr., Agent." On the side of the check were the printed words "Wm. B. Cooper, Agent." Across its face was the word "Gold." Upon the back of the check, before it was endorsed, were the following words, printed or stamped:

> "For deposit in
> Leather Manf's Nat. Bank
> to the credit of
> 
> ───────────────────
> Ag't for Ashburner & Co."

Cooper endorsed the check in question by writing " W. B.

Cooper, agent," on the line immediately below the words "Leather Manf's Nat. Bank," that is, on the line occupied by the words "to the credit of," and so as almost to obliterate the latter words. Thus endorsed, the check was delivered by Cooper to Berlin for the purpose, as the former states, of having it deposited to his credit, as agent of Ashburner & Co. Berlin presented it at the bank and received the money on it, but never accounted therefor to his principal. When Cooper first discovered that his clerk collected the amount of that check does not appear. He makes no statement on that subject.

The peremptory instruction to find against the bank upon this cause of action was, perhaps, based mainly upon the assumption that the endorsement imported a direction to place the amount of the check to the credit of Cooper, as agent for Ashburner & Co. But there is ground to contend that such was not the intention of Cooper. Evidently he had, for use, a stamp by which he could print the foregoing words upon checks which he desired placed to his credit, as agent for Ashburner & Co., leaving a blank line for his own signature. The object of this was to save time and writing. It might be asked why should he, as agent for Ashburner & Co., draw a check payable to his own order as such agent, and then direct the bank, by his endorsement as agent, to place the money to the credit of himself, as agent for Ashburner & Co. ; with one hand taking the money out of his account, as agent, and with the other putting it back immediately into the same account? And it might be argued that if he intended, by his endorsement, to direct the money to be placed to the credit of himself, as agent of Ashburner and Co., he would have written his name in the blank line underneath the words "to the credit of ; " but that, to prevent any such disposition of the money, he obliterated the operative words in the stamped lines on the back of the check by writing his name across the words "to the credit of," thus making, what the bank claims was intended, an endorsement in blank, entitling the bearer of the check to receive the money. Or, if his purpose was to take out of his account, as agent, the sum specified in his check, and at the same time show that the money was not to be used by him for his personal benefit, but

for his principals, what he did would naturally effect that object. If the endorsement was made in such manner as fairly to indicate that it was intended to be in blank, the loss should fall on the depositor whose negligence caused the mistake. These observations are not intended as an expression of opinion as to the weight of evidence upon this branch of the case. They are intended only to show that the case, as to the check for $280.97, was not clearly for the plaintiffs, and ought to have been submitted to the jury.

It results from what has been said that the court erred in peremptorily instructing the jury to find for the plaintiffs. Both causes of action are peculiarly for a jury to determine, under such instructions as may be consistent with the principles announced in this opinion. Whether the plaintiffs are estopped, by the negligence of their representative, to dispute the correctness of the account as rendered by the bank from time to time, is, in view of all the circumstances of this case, a mixed question of law and fact. As there is, under the evidence, fair ground for controversy as to whether the officers of the bank exercised due caution before paying the altered checks, and whether the depositor omitted, to the injury of the bank, to do what ordinary care and prudence required of him, it was not proper to withdraw the case from the jury. *Railroad Co.* v. *Stout*, 17 Wall. 657, 663, and *Cooke* v. *United States ; Wiggins* v. *Burkham ; Dana* v. *Bank of the Republic ;* and *Hardy* v. *Chesapeake Bank, ubi supra.*

*The judgment is reversed, and the cause remanded for a new trial, and for further proceedings in conformity with this opinion.*

Mr. Justice Blatchford did not sit in this case or take any part in its decision.