## No. 12,761.

GOODYEAR TIRE AND RUBBER COMPANY OF CALIFORNIA *v.*
FIRST NATIONAL BANK OF DENVER.
(32 P. [2d] 268)

Decided April 23, 1934.

Messrs. O'MELVENY, TULLER & MYERS, Mr. HOMER I.
MITCHELL, Messrs. PERSHING, NYE, BOSWORTH & DICK, for
plaintiff in error.

Messrs. HUGHES & DORSEY, Mr. W. CLAYTON CARPENTER,
Mr. MONTGOMERY DORSEY, for defendant in error.

*In Department.*

MR. JUSTICE BUTLER delivered the opinion of the court.

IN a suit brought June 10, 1926, by the Goodyear Tire
and Rubber Company against the First National Bank
of Denver to recover judgment for $7,582.45, with inter-
est, the court rendered judgment for the defendant. The
plaintiff seeks a reversal of that judgment.

The plaintiff, whose place of business is in Los Angeles, California, maintained a checking account with the defendant. On August 9, 1924, according to the defendant's books, there was to the credit of the plaintiff a balance of $14.40, which the plaintiff proceeded to withdraw. Among the items charged to the plaintiff's account between November 19, 1920, and January 9, 1922, were nine checks aggregating $7,582.45, which the plaintiff contends were not proper charges because, it is said, the checks were not paid pursuant to the plaintiff's order or direction.

In the course of its business, plaintiff sold its products to various dealers. It maintained sales ledgers which showed the status of the dealers' accounts. The keeping of these ledgers was under the supervision of the manager of the accounting department, and during the period here in question, 1920 and 1921, W. F. Downs was manager of that department. The issuance of checks was necessary to discharge credit balances appearing on the various dealers' ledger accounts. The first step taken as the basis of issuing a check would be a letter from a dealer or from a branch requesting a refund and a written or oral request by the manager of the accounting department requesting a check in favor of some dealer. Thereupon the clerk of whom the request was made would check the sales ledgers and determine if the dealer was entitled to the refund, and if he was, the clerk would draw and approve a sales ledger journal ticket for the amount. The ticket would be presented to the cashier's department, where a check would be typed, and thereafter the properly authorized person or persons would sign it in behalf of the plaintiff.

For the purpose of fraudulently obtaining money, Downs set up accounts in the names of fictitious or non-existing persons, showing credits in their favor. As head of the accounting department, he caused one of his subordinates to draw checks to discharge such credits. Under the direction of Downs, sales ledger journal tick-

ets were prepared, and the checks were signed by the proper person or persons. Thereafter Downs endorsed on the checks the names of the respective fictitious payees and obtained the money and appropriated it to his own use. The first of the nine checks in controversy was dated November 19, 1920; the last, December 30, 1921. Four of them were signed in behalf of the plaintiffs by officers or employees other than Downs. The other five were signed in behalf of the plaintiff by two officers or employees, one of whom was Downs, the plaintiff requiring at that time the signature of one of certain officers and the countersignature of Downs on each check. The fact that the nine checks in question were payable to fictitious or nonexisting persons was known only to Downs. The nine checks were endorsed in the names of the respective fictitious payees, and also by banks in California. Each of such bank endorsements contains a guaranty of all prior endorsements.

During the entire time covered by these transactions and up to and including August 9, 1924, when the plaintiff checked out the $14.40, the defendant sent to the plaintiff monthly statements of account, each statement being accompanied by the cancelled checks paid during the month covered by the statement.

On or about January 27, 1926, during an audit of the plaintiff's books, the irregularities in the accounts were discovered. On March 15, 1926, the plaintiff wrote to the defendant stating that checks aggregating $7,582.45 had been paid on forged endorsements and wrongfully charged to the plaintiff; and in the letter the plaintiff demanded payment. That was the first notice the defendant had of any irregularities in connection with the checks.

Counsel for the defendant contend that under section 3826 of the Compiled Laws the checks were payable to bearer, and therefore that in no event is the defendant liable. This is controverted by counsel for the plaintiff. A large part of the briefs is devoted to a discussion of

this question.  However, in the view we take of the case, we need not determine it.

The plaintiff's books were kept at the plaintiff's place of business in Los Angeles, many miles distant from the defendant's banking house.  The defendant had no access to the books, no opportunity to ascertain what was going on within the plaintiff's organization.  It sent to the plaintiff monthly statements, accompanied by the cancelled checks referred to therein.  The statements contained this notice: "Please examine at once.  If no error is reported within ten days, the account will be considered correct."  No notice of irregularity was given to the defendant until five years and nearly four months after the first check was paid and over four years and two months after the payment of the last check.  In the meantime the California statute of limitations (4 years) barred the defendant's rights of action against the California bank endorsers.

■■  The drawer of a check "is not presumed to know, and in fact seldom does know, the signature of the payee."  3 R. C. L. p. 535, §165.  In *Leather Manufacturers' Nat. Bank v. Morgan,* 117 U. S. 96, 117, 6 Sup. Ct. 657, the court said: "As the depositor was not presumed to know, and as it did not appear that he in fact knew, the signature of the payee, it could not be said that he was guilty of negligence in not discovering, upon receiving his passbook, the fact that his clerk, or some one else, had forged the payee's name in the endorsement."  In the present case, there is no evidence that the endorsements were such as to enable the plaintiff to discover that they were in the handwriting of Downs.  An examination of the bank statements and the cancelled checks would not reveal the fraud.  But there was, in the exclusive possession of the plaintiff, sources of information which upon an audit would have revealed the fictitious character of the accounts in the names of the payees in the checks, and that the plaintiff never had been indebted to persons bearing such names.  That an audit would

have revealed the fraud practiced by Downs is made evident by the fact that an audit, when made in 1926, did reveal the fraud. Assuming, but not deciding, that the checks were not payable to bearer by virtue of section 3826 of the Compiled Laws, and that originally the defendant would have been liable, the defendant, if notified of the fraud before the statute of limitations barred the right, could have made good its loss by proceeding against the bank endorsers. That right was lost, not through any fault of the defendant, but solely by reason of the neglect of the plaintiff to discover sooner what was discoverable—and in fact was discovered, but too late—by an audit.

In view of all the circumstances of the case, and of the inferences therefrom that might reasonably be drawn, and in fact were drawn by the trial court, in favor of the defendant, we do not feel that we would be justified in setting aside the finding and the judgment of the court.

The judgment is affirmed.

MR. CHIEF JUSTICE ADAMS and MR. JUSTICE HILLIARD concur.