BROWN *v*. SOUTHERN GROCERY COMPANY.

Opinion delivered April 13, 1925.

1. ACCOUNT STATED—DEFINITION.—An account stated is an account balanced and rendered, with the debtor's assent to the balance, express or implied.

2. ACCOUNT STATED—FACTS STATED.—Where a cotton grower shipped 10 bales of cotton to his factor and received an advance thereon, separate statements from the factor showing the price received for each bale of cotton, the storage, insurance, commission and net proceeds of sale, not being intended as a final settlement, did not constitute an account stated.

3. FACTORS—RIGHT TO SELL ON OWNER'S FAILURE TO PUT UP MARGINS.—Where the market declined, and the owner of cotton on which a factor had made advances failed to put up sufficient margin to cover the decline in price, the factor had the right, acting in good faith and with reasonable discretion with regard to the reimbursement of himself and the interest of his principal, to sell the property after reasonable notice to the owner.

4. FACTORS—GOOD FAITH—EVIDENCE.—A chancellor's finding that a factor acted in good faith in selling his principal's cotton after the latter had failed to put up margin to cover advances, *held* not against the preponderance of the evidence.

Appeal from Monroe Chancery Court; *John M. Elliott*, Chancellor; affirmed.

STATEMENT OF FACTS.

This action was brought in the circuit court by the Southern Grocery Company against W. S. Brown to recover $702.35, alleged to be the balance of an account due the plaintiff by the defendant.

The suit was defended on the ground that the plaintiff was a cotton factor and had been guilty of bad faith in selling the cotton shipped to it by the defendant, and that it had also charged him an excessive amount for storage and insurance.

The record shows that the plaintiff was a cotton factor and wholesale grocer at Pine Bluff, Arkansas, and the defendant was engaged in farming in Monroe County, Arkansas. On December 13, 1919, Brown wrote to the Southern Grocery Company as follows:

"Gentlemen:

"Inclosed find B/L for 9 bales cotton which I shipped you on 12/11/19. Please send me check for $1,125, as I want to draw $125 a bale on it. As soon as this cotton arrives, please let me know what you can get for it, and let me know, and I will advise you whether to hold or sell it."

The cotton was duly received by the Southern Grocery Company, and, on December 16, 1919, it wrote to W. S. Brown at Brinkley, Arkansas, the following:

"Dear sir:

"We inclose check of $1,125 advance on nine bales of cotton which we have for your account."

On March 11, 1920, Brown shipped to the Southern Grocery Company another bale of cotton, and wrote the following:

"Gentlemen:

"Inclosed you will find B/L for one bale of nice white cotton. If you can get a good offer on this bale, let me know what it is, and I will tell you whether to sell it or hold a while longer."

On June 21, 1920, the Southern Grocery Company sold one of the bales of cotton for $238.36, and, after deducting commission and other charges, there was left a balance of $225.06. An account of sale was sent to Brown when it was made. In the fall of 1920 the Southern Grocery Company wrote to Brown that, on account of the serious decline in the cotton market, the banks

were calling on it for margins, and this forced it to call in turn on its customers. Brown was requested to send in $300 on the nine bales of cotton which he had previously shipped to it. On December 29, 1920, Brown wrote the Southern Grocery Company that he had had several letters from it in regard to his cotton, and that he had been trying to sell some new cotton in order to send the $300 to cover margin as requested. The letter also contained the following: "In the last letter you talked of selling it and applying to my account. About what can you get for it now?" The letter concluded by promising to remit the margin as requested as soon as he could make some collections.

Attached to the deposition of a bookkeeper of the plaintiff is a statement of account, showing a balance due on February 8, 1923, of $687.60. In it the Southern Grocery Company charged Brown with $1,125 and interest for three years, amounting to $212.25. Brown is given credit as follows: June 21, 1920, net proceeds of sale of one bale of cotton in the sum of $225.06; July 24, 1921, net proceeds of sale of one bale of cotton $26.62; July 30, 1921, net proceeds of sale of three bales of cotton $111.70; August 21, 1921, net proceeds of sale of one bale of cotton $24.54; September 9, 1921, net proceeds of sale of one bale of cotton $39.20, and January 31, 1922, net proceeds of sale of three bales of cotton, $158.58.

According to the evidence for the plaintiff, as each bale of cotton was sold an account of sale was sent to the defendant, showing the price for which it was sold and the insurance, storage, and commission charged.

J. W. Wilkins, president and general manager of the Southern Grocery Company, was a witness for it. According to his testimony, the first he knew that Brown was going to ship any cotton to his company was when the letter inclosing the bill of lading for the nine bales of cotton was received. On receipt of the cotton the plaintiff advanced to Brown the sum of $1,125 on December 16, 1919. The amount charged for insurance, stor-

age, and commission was the usual sum charged at that time by cotton factors. In 1920 there was a serious decline in the price of cotton, and the Southern Grocery Company had on hand three or four thousand bales of cotton of about the same staple as that shipped to it by Brown. The company suffered a considerable loss in selling the cotton, and, during the year 1920, tried to make the best sale of it possible in the principal markets of the United States. It also tried to sell some of it in Canada. The cotton of Brown was finally sold in good faith for the best price obtainable, after Brown refused to put up any more margin on it. No one anticipated the heavy decline in the price of cotton which occurred in 1920 and 1921.

The testimony of J. W. Wilkins was corroborated by that of his son, W. J. Wilkins, who was the treasurer of the company. According to his testimony, the account of sales accurately showed the weight of each bale, the price received, the charges for storing, insurance, and commission, and the net proceeds. The charges were the usual charges made at that time by cotton factors, and the sales were made in good faith after Brown had refused to put up any more margin on the cotton, and because cotton kept steadily declining. No one anticipated that the price of cotton would go as low as it did in 1920. There was no market for this class of cotton in 1920 and 1921.

W. H. Kennedy, another cotton factor, corroborated their testimony as to the reasonableness of the storage, insurance and commission charges of the plaintiff, and to the further fact that there was a serious and unexpected decline in the price of cotton during the year 1920. He further stated that there was no market for the class of cotton in controversy during the year 1920.

W. S. Brown was a witness for himself. According to his testimony, when he shipped the nine bales of cotton to the Southern Grocery Company, his instructions were as follows: "As soon as this cotton arrives, let me

know what you can get for it, and I will advise whether to hold or sell it.'' At that time Brown could have got forty-five cents per pound for his cotton at Brinkley, Arkansas. After that he called the plaintiff over the telephone and told it to let him know what it could get for his cotton. Some one in the office of the plaintiff answered the telephone, and told him that the cotton would not be sold until he was advised what he could get for the cotton and would authorize them to sell it. Brown told them he would instruct them whether or not he wanted to sell it for the price reported. On January 23, 1920, Brown wrote to the plaintiff the following:

''I called you over the telephone on 16th and asked you what you could get for my nine bales of cotton which I shipped you on December 11, 1919, and you promised me you would let me know sure not later than January 19, and up to date I have not heard a word from you. I want to know, because I have about 15 bales more and have had an offer on them here, and I wanted to see if it would pay me to ship them to you or sell them here. Please let me know what you can get for it at once.''

Brown admitted that he was to pay 6 per cent. interest on the advance made to him by the plaintiff, but said that they chose the date at which cotton was selling for the lowest price to sell his cotton.

The case was transferred to the chancery court on the motion of the defendant, and tried there by consent of parties. The chancellor found the issues in favor of the plaintiff, and, from a decree in its favor, the defendant has duly prosecuted an appeal to this court.

*Bogle & Sharp.* for appellant.

*W. T. Wooldridge,* and *Lee & Moore,* for appellee.

HART, J., (after stating the facts). It is first sought to uphold the decree on the theory that the account of sales sent by the plaintiff to the defendant had become an account stated.

On this point the record shows that an account of sale for each bale of cotton was sent by the plaintiff to the

defendant, and the statement showed the price received for the cotton, the storage, insurance, and commission of .the plaintiff, and the net proceeds of sale. These facts did not constitute a cause of action on an account stated. An account stated is an account balanced and rendered, with an assent to the balance, express or implied. Ten bales of cotton were shipped by Brown to the Southern Grocery Company to be sold by it for him, and an advance of $1,125 was made to him on the cotton. The account does not appear to have been intended as a final adjustment and settlement between the parties, and the facts do not show an agreement, express or implied, that it should be so regarded. *Glasscock v. Rosengrant*, 55 Ark. 376.

When Brown shipped the nine bales of cotton to the Southern Grocery Company on the 11th day of December, 1919, he told it that he wanted to draw $125 a bale on it. The letter also advised the plaintiff to let him know what it could get for the cotton, and he would advise it whether to hold or sell it. On the 23rd day of January, 1920, Brown wrote the plaintiff that he had called it over the telephone on December 16, 1919, and asked it what he could get for his nine bales of cotton, and that the plaintiff promised to let him know not later than January 19, 1920. He reminded the plaintiff that he had not heard from it, and wanted to know, because he had fifteen bales more that he wanted to sell. The plaintiff sold one bale of cotton for $228.36, and, on June 21, 1920, it sent the defendant an account of sales showing the net proceeds, $225.06. No objection was made to this sale. During the fall of 1920 there was a great decline in the price of cotton, and the plaintiff wrote several letters to the defendant demanding that he put up an additional margin of $300 to cover the advance made by the plaintiff to him. On December 29, 1920, Brown wrote the plaintiff that he would send the $300 as soon as he could sell some of his new cotton. In the letter he asked plaintiff what it could get for his cotton, and referred to the fact that, in its

last letter, the plaintiff had talked of selling his cotton and applying the proceeds to his account because he had failed, to put up the additional margin requested by it. The plaintiff, in several letters, notified the defendant that it would sell the cotton unless an additional margin was put up to cover the fall in the price of cotton.

Under these circumstances the plaintiff had a right to sell the cotton in the usual course of trade to reimburse it for the advance already made by it, and was only bound to exercise good faith towards the defendant in selling the cotton.

The general rule is that, under circumstances of this kind, the factor has a right, acting in good faith, and with reasonable discretion, with regard both to the reimbursement of himself and the interest of his principal, to sell the property after reasonable notice to the owner. *Davis* v. *Kobe,* 36 Minn. 214; 1 Am. St. Rep. 663; *Phillips* v. *Scott,* 43 Mo. 86; 97 Am. Dec. 369; *M. M. Walker Co.* v. *Dubuque Fruit & Produce Co.,* 113 Iowa 428; 53 L. R. A. 775; *Blot* v. *Boiceau,* 3 N. Y. 78; Am. Dec., 345, and case-note in 58 Am. Dec., p. 160; 11 R. C. L. § 19, p. 767, and 25 C. J., p. 360. See also *Burke* v. *Napoleon Hill Cotton Co.,* 134 Ark. 580, and *Wynne, Love & Co.* v. *Bunch,* 157 Ark. 395.

If the defendant wished to prevent the plaintiff from selling the cotton to discharge the amounts advanced by it, he should have put up the margin demanded by the plaintiff, and, having failed, it would only be required to exercise good faith in the sale of the cotton. According to the testimony of the defendant, the plaintiff sold the cotton on the dates on which the price was the lowest. According to the evidence for the plaintiff, there was no market at all in the latter part of 1920 for the class of cotton in controversy. The plaintiff lost a considerable amount of money on this class of cotton because it was unable to sell it. While the account of sales does not constitute an account stated, for the reason given above, still it is a fact which tends to prove the good faith of the plaintiff in selling the cotton. The cotton was sold on

various dates in the years 1920 and 1921, and the last three bales were sold in the first part of 1922. On each date on which the cotton was sold the plaintiff sent a statement to the defendant showing the price for which it was sold, and the commission, storage and insurance charges. The defendant was thus advised of the price for which the cotton was sold and the net proceeds which he was to receive. He made no objection to any sale reported to him, and good faith on his part would seem to require that he should have objected to the sale of the cotton.

In any event, the sending of the statement by the plaintiff tended to show its good faith in the matter. The extreme decline in the price of the cotton seems to have resulted disastrously to every one, and certainly was not anticipated by the plaintiff. The record shows that it had three or four thousand bales of cotton of this same class or grade which it was unable to sell, and on which it suffered considerable loss. While the low price for which the cotton was sold is evidence of bad faith on the part of the plaintiff in selling the cotton, still it cannot be said that, when all the surrounding circumstances are considered along with the evidence for the plaintiff, the finding of the chancellor in favor of the plaintiff is against the weight of the evidence.

Under the settled rules of this court the finding of facts made by a chancellor will not be disturbed on appeal, unless it is against the preponderance of the evidence.

It follows that the decree will be affirmed.