882

WORTHEN BANK & TRUST COMPANY *v.* KELLEY-NELSON
CONSTRUCTION COMPANY.

4-9615                                    245 S. W. 2d 405

Opinion delivered January 28, 1952.

*Wright, Harrison, Lindsey & Upton,* for appellant.

*Pat Mehaffy* and *John F. Park,* for appellee.

SHIELDS M. GOODWIN, Special Justice.   On April 1,
1948, G. Larry Kelley and Louis C. Nelson became part-
ners in the construction business in Little Rock under
the firm name of Kelley-Nelson Construction Company
(hereinafter called the company), plaintiff in the court
below and appellee here.   The company engages in the
construction of commercial buildings in the $25,000.00-
$75,000.00 price range.   During the year ending April 1,
1950, it did approximately 30 jobs, and, at the time of the
trial, had six buildings under construction.

Throughout the relevant period, (the eleven-month period beginning May 12, 1949), the company maintained an account in the Worthen Bank & Trust Company, of Little Rock (hereinafter referred to as the bank), defendant in the court below and appellant here. The partners were the only persons authorized to sign checks against this account. Over the period in question, Mrs. Katheryn Eldridge, who was employed by the company as a part-time bookkeeper, forged Nelson's name to 24 checks in the amount of $400.00 each and to one check for $200.00 against the company's account. She had no confederates, either in the bank or in the company, who assisted her in perpetrating the fraud. The bank, after applying the usual protective measures, paid the checks and charged them to the company's account, believing them to be genuine.

In accordance with its custom with all its depositors, the bank mailed the company on or about the last day of every month all cancelled checks against the company's account which had been paid during that month and a statement which showed the company's balance at the beginning of the month, all debits against, and credits to, the account during the month, and the company's balance at the end of every day during the month on which there was a debit or credit. The partners examined the cancelled checks and statements in a manner that will be more fully described later, but did not find the 25 unauthorized charges (about two each month) which the bank made to the company's account (As will be seen later, the original forged checks had been removed by Mrs. Eldridge). The forgeries were discovered for the first time by a firm of certified public accountants which, in April, 1950, in due course, audited the company's books for its fiscal year, which ended March 31 of that year.

Promptly after the accountants reported the forgeries to the company, it made demand upon the bank for repayment to it of the total amount of the forged checks. The bank declined to make restitution, taking the position that the loss must fall upon the company

by reason of its failure for eleven months to examine the cancelled checks and bank statements with sufficient particularity to discover the fraud; whereupon the company sued the bank for $9,800.

The trial court overruled the bank's motion for a directed verdict in its favor. At the close of the trial, the court instructed the jury upon the law of the case. By a nine to three verdict, the jury found for the company. While the bank objected to the court's rulings on several of the instructions offered by each party, it does not seriously contend, and, in its belief, does not even argue, that the court's rulings on any of the instructions given or refused were erroneous, except, of course, that it does strenuously maintain that there was not sufficient testimony to take the case to the jury and that the court below erred in not giving the peremptory instruction in favor of the bank.

The sole question on this appeal, therefore, is whether the court erred in refusing to grant the bank's motion for a directed verdict.

At this point, reference is made to the audit and to the manner in which the forgeries were discovered. It was not until the third day that the accountants suspected that anything was wrong with the company's books. At that time, they found the record of a payroll check for $22.15 which was still outstanding, although it had been drawn several months before. They then checked the bank statement for the month in which the charge appeared and found that a check for *$122.15* against the account had been paid in that month. Through the courtesy of the bank, the accountants and Kelley then looked at the picture machine in the bank and saw the check for $122.15, payable to the order of Katheryn Eldridge. Kelley thereupon advised the accountants that the company had never paid her that much on any payroll check. This led to a sweeping and searching investigation of all of the company's checks that had been paid since March 31, 1949, and a comparison of these checks against the monthly bank statements as

well as against the company's books. The result was the discovery that she had forged the 25 checks sued on.

The forgeries were very skillfully accomplished. In fact, the bank first denied that the checks had been forged. One of its tellers testified that it is possible that they were traced, adding that he conscientiously believed at the time he passed them that they were Nelson's signatures; and the bank's vice-president and cashier said that he would have passed them as genuine (As is pointed out later, the good faith of the bank in paying the checks is not, under the circumstances of this case, material). The bank later conceded that the checks sued on were forgeries.

The accountants also discovered four additional checks (including the one for $122.15 described above), each of which was in the amount of approximately $122.15 and had been raised by $100. Mrs. Eldridge was the payee and endorser on these as well as on the checks upon which this suit was brought. The company did not sue on the checks which Mrs. Eldridge had raised for the reason that one of the partners signed at least one of them before the words containing the amount had been written in, thereby making it possible for her to raise it.

Mrs. Eldridge, of course, made no entries on the journal or on the check stubs reflecting any of the checks which she had forged. Moreover, when the audit was made in April, 1950, the 29 original cancelled checks which had been forged or raised were not found among the checks which the bank had returned to the company, Mrs. Eldridge evidently having destroyed them as soon as she was able to abstract them from the monthly statements in which they were enclosed. The record, however, contains photostatic copies of these checks which were made from the bank's records.

The record also contains eight original cancelled checks, *which were apparently but not actually genuine.* All of them were drawn on the appellant bank. They ranged in amounts from $234.65 to $1,044.30, and totaled

$5,609. The payees were concerns with which the company did business. The checks bore the forged signature (as maker) of Nelson; and the endorsements of the payees were likewise not genuine. The checks were never delivered to the payees and, according to the undisputed testimony of a vice-president of the Union National Bank of Little Rock, whose endorsement appears on their reverse side, the stamped endorsement of that bank on the checks was not genuine. Moreover, according to the uncontradicted testimony of the vice-president and cashier of the appellant bank, the "paid" perforation cancellation of these eight checks was likewise not genuine. In other words, they were entirely fabricated by Mrs. Eldridge, and are described in the record as "fictitious facsimiles." Her evident purpose in "getting up" these checks was not only to "throw off" the accountants as well as the company but also to make it appear to Kelley and Nelson that the company had, in the regular course of business, paid out these substantial amounts, thus depleting the company's balance in the bank and correspondingly reducing the amount of the shortage occasioned by her fraud. While these checks have no direct bearing on the issues, we mention them to show how "clever" Mrs. Eldridge was and the lengths to which she went in accomplishing her oblique and nefarious purpose and in concealing her fraud.

We come now to a consideration of the law of the case. Notice should first be taken of certain evidence offered by the bank. Three of its officers and employees explained in great detail how meticulously the bank was in sight-posting and machine-posting these checks, always with the signatures of Kelley and Nelson before them. This evidence establishes beyond any question that the bank exercised a high degree of care in examining Nelson's signature to the checks before it cashed them and charged them to the company's account. And yet we are met by the stubborn fact that, entirely apart from the bank's good faith in the premises, it honored the forged checks sued on. For these errors on its part, *the bank is liable unless,* as was said by this court in *Bank of Black Rock* v. *B. Johnson and Son Tie Company,* 148 Ark.

11, 14, 229 S. W. 1, *the depositor "is precluded from setting up the forgery or want of authority."* There, the court set out § 23 of the Negotiable Instruments Law (then § 7789, Crawford & Moses' Digest, now § 68-123, Ark. Stats. 1947), as follows:

"When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party, against whom it is sought to enforce such a right, is precluded from setting up the forgery or want of authority." Construing this statute, the court said (148 Ark. 14):

"Under this section payment upon a forged check by a bank upon whom it is drawn is made at the bank's peril, and it is not justified in charging it against the depositor's account unless the latter is precluded from setting up the forgery or want of authority."

In *Union Tool Co.* v. *Farmers and Merchants' National Bank,* 192 Cal. 40, 218 P. 424, 28 A. L. R. 1417, 1421, the Supreme Court of California stated the rule as follows:

"It is a well-settled general rule that as between a bank and its depositor the bank is only warranted in paying out money of the depositor on his genuine order and in accordance therewith. If payments be made on a forged check, with no attendant circumstances sufficient to create an equitable estoppel as against the depositor, or there has been no prior negligence by the depositor contributory to the payment of the check, no degree of care on the part of the bank will excuse it from liability" (citing cases).

And, in *Critten* v. *Chemical National Bank,* 171 N. Y. 219, 63 N. E. 969, 970, the Court of Appeals of New York said:

"Therefore, when the fraudulent alteration of the checks was proved, the liability of the bank for their amount was made out, and it was incumbent upon the defendant to establish affirmatively negligence on the

plaintiffs' part to relieve it from the consequences of its fault or misfortune in paying forged orders."

It follows, therefore, that, even if a bank has employed every known means, device and test in an effort to avoid the payment of a forged check and has thereby exercised the highest degree of care in protecting its depositor, it will, if the check is forged, be liable to him unless the depositor "is precluded from setting up the forgery or want of authority"; and "no degree of care on the part of the bank will excuse it from liability." In other words, although the forgery is a "perfect" one, the bank is liable unless the depositor is precluded.

We have not outlined the large amount of evidence which the bank offered on the question of the care which it exercised, this for the reason that this testimony relates to the *bank's negligence,* or rather freedom from negligence, which matter is not a proper subject of inquiry. The one material issue in this case is: Was it proper for the trial court to submit to the jury the question whether the *depositor* (the company) exercised ordinary care in its monthly examination of the cancelled checks and bank statements which the bank mailed to it?

In cases involving facts similar to those in the case at bar on the question whether a depositor has exercised the degree of care which the law imposes on him in detecting a forgery, there are three lines of authorities: (1) Those courts which hold the bank liable for forgery, even though the depositor never examined the monthly bank statements or his cancelled checks; (2) those courts which hold that the depositor is liable as a matter of law for failure to examine the monthly bank statement and cancelled checks with sufficient particularity to discover the forgery; and (3) those courts which hold that it is a question for the jury to determine whether the depositor exercised ordinary care in examining the monthly bank statement and cancelled checks, even though the examination was not made with sufficient particularity to discover the forgery.

It would unduly lengthen this opinion to analyze or even to refer briefly to all the authorities, which are nu-

merous. We have examined all the authorities referred to in the briefs and have also made an independent investigation. In the discussion that follows, we refer only to selected cases which are typical of the three views.

The early (1854) case of *Weisser's Adm'rs* v. *Denison*, 10 N. Y. 68, 61 Am. Dec. 731, goes all the way in absolving a depositor of the charge of negligence in not discovering that a bank has charged forged checks to his account, holding that a depositor is under no duty to examine his cancelled checks or the bank book. There, the Court of Appeals of New York said (61 Am. Dec. 738):

"Whatever loss the bank sustained, it has suffered from its own negligence or want of skill in a manner as to which, in the first instance, it and it only was bound to exercise skill and diligence. To this loss no act of Weisser (the depositor) has contributed. He was guilty of no bad faith. He has violated no duty which he owed to the bank, and is in no way responsible (citing cases). * * * He was under no contract with the bank to examine with diligence his returned checks and bankbook. In contemplation of law, the book was balanced and the checks returned for his protection, not for theirs; and, when he failed to examine it, the whole consequence was that the burden of proof was shifted. He became bound to show that the account was wrongfully stated. This right was preserved so long as his claim was not barred by the statute of limitations."

We reject this view, since we are of the opinion that the depositor does owe a duty to the bank where, as there and here, the bank returns to him monthly his cancelled checks and a statement of his account. The extent of that duty will be considered later in this opinion.

A typical case under the second line of authorities above referred to is *Critten, et al.* v. *Chemical National Bank* (1902), *supra*. There, the depositors had in their employ a faithless clerk named Davis, who over a 25-month period, raised 24 of his employers' checks, most

of them by $100. They customarily entrusted to him the verification of their bank balance, and he, of course, withheld from them knowledge of his fraud. The forgeries were discovered by one to whom, in Davis' absence, the verification of the bank balance was committed.

The referee found for the depositors; but, on appeal, that judgment was reversed, the court holding substantially that the depositors were negligent as a matter of law in the examination of their pass book and cancelled vouchers, by reason of which negligence they were precluded from recovery. The court said (63 N. E. 973):

"In the present case Davis falsified the additions or totals at the foot of the pages in the check book. But with a few exceptions he did not alter the amounts expressed in the stubs. In no case did he change in the stubs the name of the payee of the check. It is clear, therefore, that at all times a comparison of the returned checks with the stubs in the check book would have exposed the alterations made in the checks."

It would not have been so easy to detect Mrs. Eldridge's forgeries for the reason that she did *not* fill in the stubs of the checks.

Thus it will be observed that the New York court in this case repudiated the doctrine of the *Weisser's Adm'rs* case, as reflected by the above quotation from the opinion in that case. As stated above, we reject the extreme view of that case; but we are also of the opinion that, in the *Critten* case, the court went too far in the other direction in holding, as a matter of law, that the depositor did not exercise ordinary care.

*Frank* v. *Chemical National Bank,* 84 N. Y. 200, 38 Am. Rep. 501, was decided in 1881, after the *Weisser's Adm'rs* case and before the *Critten* case. There, as will be seen under our discussion of the third line of authorities, the New York court, in affirming a judgment for the depositor, adopted what we hold to be the correct view when, after saying that it is proper "to exact from

the latter (the depositor) some attention to the account when it is made up," hastened to add (38 Am. Rep. 503) :

"But where forged checks have been paid and charged in the account and returned to the depositor, he is under no duty to the bank so to conduct the examination that will necessarily lead to the discovery of the fraud."

The third line of authorities adheres to the rule which we have adopted in the *Bank of Black Rock* case, *supra*. There, the depositor kept a forged check seven days without complaining that it had been forged, and permitted the bank to charge the check to its account. The question was whether the depositor was "precluded from setting up the forgery." The trial court directed a verdict in favor of the depositor. This court reversed that judgment, holding that "it became its (the depositor's) duty to examine the checks which were returned to it and exercise reasonable care to see whether any of them had been forged and, if so, to notify the bank of that fact," adding (148 Ark. 17) :

"Under the circumstances, we think the court erred in directing a verdict for appellee, and that it should have submitted to the jury the question of whether or not appellee had exercised ordinary care in examining the checks and discovering the forgery and reporting it to the bank."

The bank urges us to reverse this judgment on the authority of *Bank of Hatfield* v. *Clayton*, 158 Ark. 119, 250 S. W. 347. But the facts there are clearly distinguishable from those in the case at bar. There, the appellee, a depositor in appellant bank, was advised by the bank's vice-president, by letter dated June 11, 1921, that he had loaned $1,000 of her money on deposit in the bank at 10%. Although it was not known by the depositor at that time, it later developed that the vice-president had loaned the money to himself. It was not until October 1, 1921, that the depositor requested that the $1,000 be placed back to her credit. In her suit against the bank, this court denied recovery because she waited more than

three months after she was formally advised that her money had been withdrawn. Here, the bank concedes that the company notified it of Mrs. Eldridge's defalcations as soon as it learned of them; and we hold that it was for the jury to determine whether the company exercised ordinary care in not discovering the forgeries more promptly.

*Farmers' Bank & Trust Company* v. *Boshears*, 148 Ark. 589, 231 S. W. 10, 15 A. L. R. 426, *Bank of Hatfield* v. *Chatham*, 160 Ark. 530, 255 S. W. 31, and other Arkansas cases are relied upon by the company. While the facts in these cases are not entirely analogous to those in the case now before the court, they tend to support the rule for which the company contends. None of them, at least, is at variance with that rule. The doctrine of the *Bank of Black Rock* case has never been overruled or modified by this court, and we now re-affirm it.

We consider now three cases from other jurisdictions which have also adopted this view. The first of these is *First National Bank of Richmond* v. *Richmond Electric Company*, 106 Va. 347, 56 S. E. 152, 7 L. R. A. N. S. 744. There, one Woodall, a clerk of the depositor (the electric company), over a period of 18 months raised 26 of its payroll checks by the sum of $100 each. The bank contended that the depositor should not be permitted to recover for the reason that it had not exercised the degree of care which the law cast upon it in the matter of the examination of its pass book and vouchers. In the lower court, the depositor recovered. That judgment was reversed on account of the error in a certain instruction.

On appeal, the court, after conceding "that the fraud could have been instantly discovered by verifying the additions made by Woodall on the stubs of the check book, or by the president looking at both the pass book and the check book on any one of the occasions when the examination was made by Woodall and himself together" (56 S. E. 152), held firmly that the question whether the depositor exercised reasonable care and diligence in the premises was for the jury. It said (56 S. E. 153) (italics supplied):

"In the case at bar there was evidence tending to show that the plaintiff did not examine its pass book and the vouchers returned therewith with reasonable care and diligence, and did not exercise reasonable care and diligence in supervising the conduct of its agent while the latter was examining such pass book and vouchers. *Whether he did so exercise reasonable care and diligence was, under proper instructions, a question to be determined by the jury.*"

In *Brown* v. *Lynchburg National Bank,* 109 Va. 530, 64 S. E. 950, 17 Ann. Cas. 119, the employees of the appellee bank embezzled its funds, fraudulently making numerous unauthorized debits against appellant depositor's (Brown's) account. Brown did not keep a pass book, but relied solely upon monthly statements which the bank rendered to him when it returned to him his cancelled checks. Included with the statements and cancelled checks was a machine-made slip which purported to, but did not, contain a complete list of all debits. Assuming that the list corresponded with his cancelled checks, Brown did not compare the checks against the list, with the result that the bank's employees falsely charged his account with a total of $3,066.20 not represented by Brown's cancelled checks. He did not make a "critical examination" until the deceitful practice had systematically been continued for a period of 40 months.

On these facts, the trial court sustained the bank's demurrer to the evidence, evidently taking the view that the depositor's examination of his account was perfunctory only, that he had not taken the precaution which a person of ordinary prudence should have taken and that, if he had done so, the fraud would have been discovered promptly. On appeal, the Virginia court pointed out "that the fraud was perpetrated in this case in a very crude and simple manner" and that it was discovered as soon as the depositor made a thorough examination; but it reversed the judgment of the trial court, *holding that the sufficiency of the depositor's examination was a question for the jury to determine under proper instruc-*

*tions, not a question for the court.* The court said (64 S. E. 951):

"It is difficult to conceive of a fraud more easy of detection than the one under investigation. As soon as a comparison was made by plaintiff in error between the machine-made slip and the checks which he had drawn, the fraud was discovered, and yet plaintiff in error had for three years accepted the bank's statements without question. If upon this evidence the case had been submitted to the jury, and it had found a verdict for the defendant, it could not have been disturbed."

If it should be contended by the bank in the case at bar that the *Brown* case is a false entry case rather than a forgery case and is therefore not a precedent for the view we take of the case at bar, the answer is that a bank's duty to refuse to pay a forged check on a depositor's account is certainly no less than its duty to prevent an unauthorized debit against his account.

*Leather Manufacturers' National Bank* v. *Morgan,* 117 U. S. 96, 29 L. Ed. 811, 6 S. Ct. 657, is the leading case in this country on the question under consideration, and has been repeatedly cited with approval by this and other courts. In that case, the depositor's clerk committed forgery in raising the amounts of certain checks. Despite due care on the part of the officers of the bank, the checks were paid and charged to the depositor's account. In a suit against it by the depositor, the bank defended on the ground that he did not exercise the degree of care required of him to discover the fraud perpetrated by his clerk. The trial court directed a verdict in favor of the depositor. On appeal, that judgment was reversed, the Supreme Court of the United States holding that a depositor in a bank is bound, personally or by an authorized agent, to examine with due diligence his pass book and vouchers and to report to the bank, without unreasonable delay, any errors which he may discover, and that, if he fails to do so and if the bank is thereby misled to its prejudice, he cannot afterward dispute the evidence of the balance shown by the pass book.

The court took occasion to observe that there was evidence tending to prove that, with one exception, the depositor gave practically no attention to the account rendered by the bank and that "very slight diligence" would have revealed the fraud; but it was careful to say (117 U. S. 116): "We must not be understood as holding that the examination by the depositor of his account must be so close and thorough as to exclude the possibility of any error whatever being overlooked by him." The court concluded that *the question whether the depositor exercised the diligence required of him was for the jury, not for the court,* and that the trial court should have submitted to the jury the question whether the depositor omitted, to the injury of the bank, the due care and prudence required of him in the matter of the examination of his pass book and vouchers. We approve this clear statement of the rule.

We come now to consider the evidence as to the nature of the examination of the bank statements and cancelled checks made by the company in the case at bar, together with the related question whether this court can say, *as a matter of law,* that the examination so made fell short of ordinary care. If reasonable minds might conclude that the company exercised ordinary care in the premises, then the court below properly refused the peremptory instruction and submitted the case to the jury.

On May 12, 1949, the first of the 25 checks in question was forged, paid and charged to the company's account. The bank contended—and it cannot be successfully gainsaid—that an exhaustive examination by the depositor would have revealed the fraud as early as June 1, 1949, on which day the company received from the bank the May statement and cancelled checks paid during that month. But such an examination would likewise have promptly revealed the forgeries in the *First National Bank of Richmond, Brown* and *Leather Manufacturers' National Bank* cases. In fact, "the fraud could have been instantly discovered" in the first of these cases; in the second, "the fraud was perpetrated" "in a very crude

and simple manner,'' and it was ''difficult to conceive of a fraud more easy of detection than the one under investigation''; and, in the third, ''very slight diligence'' would have revealed the forgeries. And yet it was held in all three of those cases that the question was one for the jury. We conclude, therefore, that the fact that the fraud *could* have been discovered upon a thorough examination of any one of the eleven bank statements and the cancelled checks enclosed therewith is not decisive of the issue. We must examine the evidence further in order to ascertain whether the company's examination was so perfunctory as to require the trial court to instruct a verdict for the bank.

The bank deems it significant that a considerable number of check stubs were altogether blank or were marked ''void.'' This circumstance is insufficient to put the company on notice that there might be forgeries against its account. While Mrs. Eldridge prepared most of the checks for signature by one of the partners, the partners frequently prepared the checks. They testified that, by reason of there being so many deductions, withholdings, etc., to be computed, they would frequently make mistakes in preparing checks and would ''void'' the first check so prepared and also its stub; and it can easily be seen that Mrs. Eldridge might honestly make similar errors, and that both she and they might sometimes leave the check stubs (of voided checks) blank.

The bank stresses the testimony to the effect that Mrs. Eldridge was not living with her husband and that she had three children, two of whom were living with her; that two writs of garnishment in the amounts of $67.50 and $274.53, issued pursuant to judgments against her, were served on the company; and that, on April 5, 1949, she borrowed $600 from the appellant bank on a note endorsed by one of the partners. The bank contended that these circumstances should have put the company on notice that Mrs. Eldridge was under a heavy expense and in straitened financial circumstances and that it should have been particularly on guard against

forgery. The record showed that she was making payments on the note out of her salary from the company at the rate of $12.50 per week, and that the company knew this. These circumstances do not entitle the bank to a directed verdict.

There are many circumstances which, taken together, support the view of the trial court that a case for the jury was made. Mrs. Eldridge was recommended to the partners as a highly competent bookkeeper. One of them had known her in high school. Neither of them had any reason to believe that she would prove to be a faithless employee. Her employment commenced on August 1, 1948—eight months before the first audit of the company's books was made for its fiscal year ending March 31, 1949. That audit showed that the books were in balance. It doubtless served to make the partners believe that Mrs. Eldridge would not betray her trust.

The bank statement and cancelled checks were mailed to the company at a Post Office box, to which only the partners had access. This made it impossible initially for Mrs. Eldridge to abstract the checks which she had forged or the bank statement. The custom was that the partner who happened to get the statement and cancelled checks from the box would take them to the company's office and, on the afternoon of that day or the next day, open the envelope and examine the checks, of which there were 400 or 500 each month, and the statement. Two employees of a concern which, throughout the relevant period, shared a 15′ x 20′ office with appellee, testified that, on numerous occasions, they saw both Kelley and Nelson "looking through their cancelled checks when they were returned at the end of the month."

The partners sometimes sorted the checks themselves, each partner looking through the checks and examining particularly the ones which he had signed, having in mind the jobs to which the several checks were referable. They frequently examined the accounts of the various jobs to see how their total expenditures thereon compared with the prices at which they

bid them in. It was not possible for the check stubs to show the balance in the company's account at the bank for the reason that the company kept two check books, one for the payroll and one for other persons and concerns to whom it owed money.

The partners testified that they called on the persons or concerns for whom they were constructing buildings for payments on the jobs as the work progressed, adding that they were fortunate in doing work for people who paid them on time. In this way, they were usually enabled to ''operate a job on someone else's money'' because the company's bills did not become due until the tenth day of the month. The company's bank balance ranged from $16,000 to $35,000. Under a rigid cross-examination, the partners testified that it was not until they were informed of the shortage by the accountants in April, 1950, that they knew, or had any reason to believe, that the company's balance in the bank was less than it should have been, that there had been any forgeries against the company's account or that its books were otherwise out of balance. It will be remembered that the eight ''fictitious facsimiles'' which, at first, even the accountants believed to be genuine, accounted for $5,609 of the $9,800 shortage.

There remains for consideration only the question whether the company is precluded from recovering its loss because it did not object within a reasonable time to the monthly statements which it received from the bank, near the end of all of which statements was the sentence: ''If no error is reported in 10 days the account will be considered correct.'' The bank's position is that the company thereby acquiesced in the correctness of the statements, which thereby became accounts stated and included the debits of the forged checks upon which this suit was brought.

In *Brown* v. *Southern Grocery Company,* 168 Ark. 547, 552, 271 S. W. 342, 40 A. L. R. 383, an account stated was defined as ''an account balanced and rendered, with an assent to the balance, express or implied.'' We fully

appreciate the efficacy of this doctrine, in a proper case, as working an estoppel in the nature of an implied admission, by the person to whom the account is rendered, of its accuracy; but where the question is, as we have held it to be in this case, whether a depositor has exercised ordinary care in examining his cancelled checks and bank statements, the doctrine of account stated cannot be employed to foreclose an inquiry into the question whether such care has been exercised. That question having been resolved, by the verdict of the jury, in favor of the depositor, there is no room for the application of the doctrine for which the bank contends.

We, therefore, conclude that, the forgery of the checks sued on having been established, the bank is liable unless the depositor is precluded from setting up the forgery; that, under the facts in this case, the depositor was not precluded unless it failed to exercise ordinary care in examining monthly its cancelled checks and the statements which it received from the bank; that the trial court properly submitted to the jury the question whether the depositor exercised ordinary care in the premises; and that there was substantial evidence to support the verdict.

Accordingly, the judgment is affirmed.

Mr. Justice SAM ROBINSON disqualified and not participating.