ÁNGEL PORTILLA, doing business under the name of A. PORTILLA & Co., Plaintiff and Appellant, *v.* BANCO POPULAR DE PUERTO RICO, Defendant and Appellee.

No. 10619. Argued December 9, 1952.—Decided June 30, 1953.

L. E. Dubón, R. García Cintrón, L. Ríos Algarín, F. Fornaris, Jr., Diego Guerrero Noble and Jaime Pieras, Jr., for appellant. Damián Monserrat, Jr., Gabriel de la Haba and Rafael Baragaño, Jr., for appellee.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

This case involves a total claim for $26,139.39 which, according to plaintiff, was unduly charged to his current account by the defendant bank, as a result of the payment of a series of checks drawn with his forged signature. The complaint was dismissed, the payment of costs being imposed on plaintiff, plus the sum of $1,000 attorney's fees for defendant; from all of which, plaintiff has appealed to this Court.

The court a quo set forth the following findings of fact:

"That plaintiff, Ángel Portilla, doing business under the name of A. Portilla & Co., opened a current account in the Banco de Puerto Rico, about July 5, 1933. When the Banco de Puerto Rico was merged with the Banco Popular de Puerto Rico, the current account of A. Portilla & Co., passed to the latter bank, plaintiff becoming one of the depositors of the defendant bank.

"Plaintiff's current account at the Banco de Puerto Rico was opened without the latter imposing any special condition on the depositor in connection with the duty of examining the statements of account which the banks send monthly. When plaintiff's account was transferred to the defendant bank he was not imposed any condition to examine his monthly statements of account; nor was he warned that he should examine said statements of account and report exceptions, if any, nor was his attention called to the text appearing in the statements to the effect that if no exceptions are reported within ten (10) days, it will be understood that the account has been found correct.

"In the records of the Banco Popular de Puerto Rico there appears only one card with the registered signature of the depositor plaintiff A. Portilla & Co. The Banco Popular de Puerto Rico requires two record cards with the signatures, and in the case of a joint account, it requires three, but the number of record cards required by the Banco de Puerto Rico did not appear from the evidence. According to the signature registered by plaintiff the checks drawn against his current account in the bank should be paid when signed with the registered signature of A. Portilla & Co., and except for the period between 1935 and 1938, during which Alfredo Argüelles was authorized to draw against plaintiff's current account, the withdrawals of funds could only be made through the drawing of checks signed by plaintiff himself, using the registered signature of A. Portilla & Co.

"About the end of 1939 or the beginning of January, 1940, plaintiff entered into an agreement with Teodomiro Rangel, a professional bookkeeper, by which the latter was to take charge of all the bookkeeping of his commercial establishment, including the account in the defendant bank, to examine the bills, to answer the mail and prepare the checks. For this purpose, Rangel visited Portilla's commercial establishment twice a month, usually after working hours and on Sundays, and he received for this work a weekly salary of five dollars ($5.00.).

"Plaintiff had known Rangel since 1927 and had known his parents. Rangel had formerly worked with Portilla; had lived at his house and was fully trusted by him. Portilla never had any reasons whatsoever to distrust Rangel.

"At some time in the month of January, 1940, Teodomiro Rangel conceived the idea of defrauding Portilla and the defendant bank by forging the signature of A. Portilla & Co., and making out checks against plaintiff's account in the defendant bank. From January 16, 1940 up to January 18, 1943, Rangel forged Portilla's signature in one hundred and seventy-one checks payable [to the bearer], for a total of twenty-six thousand one hundred and thirty-nine dollars and thirty-nine cents ($26,139.39). Of the one hundred and seventy-one forged checks only four originals and ninety-three photographs were introduced in evidence. The evidence as a whole, however, especially José Díaz Santiago's testimony, this witness report admitted in lieu of his testimony, and Rangel's testi-

mony on the manner in which he covered up the forgeries, shows that Rangel forged and the defendant bank paid one hundred and seventy-one checks for the amount of twenty-six thousand one hundred and thirty-nine dollars and thirty-nine cents ($26,139.39).

"Portilla's signature in the checks paid out by the bank was skillfully forged. Free of suspicion, it is impossible for a person who is not an expert in the subject matter to discover the forgeries. The forged signatures are so similar to the signature which appears in the record card that the expert for the plaintiff believed, before examining closely the registered signature, that the latter was also forged, and plaintiff himself admitted that when some films of the checks were shown to him, he was unable to point out the forged checks.

"There is nothing in the forged checks which might arise the suspicion of the employees of the bank. They have no erasures or scratches nor are they undated or with an advanced or back date.

"All throughout the time that the checks on which this suit is based, were being forged, the defendant bank sent to the plaintiff, monthly, according to its practice and custom, a statement of account. These statements of account were sent to plaintiff at the beginning of each month. Portilla received the statements of account corresponding to each and everyone of the months comprised within the term during which the forged checks were paid and cashed, with the exception of the one corresponding to the month of December, 1942, which should have reached him at the beginning of January, 1943. Together with the statements of account, the bank sent plaintiff the cancelled checks which had been paid during the month corresponding to each statement of account.

"During the term comprising the months in which the bank paid the forged checks, the monthly statements of account were sent to plaintiff in three different ways. First by a messenger, who delivered the statements to any person in Portilla's establishment, that person acknowledging receipt thereof in a notebook; afterwards they were delivered to Teodomiro Rangel at the bank and starting June, 1942, at plaintiff's request, they were mailed to him. Rangel's action of collecting the statements of account at the bank was known to Portilla and he agreed and approved it. The statements sent by mail were personally received by Portilla at the box or by any other of

his employees to whom he gave the key for the box to bring the mail.

"Plaintiff never examined the bank statements. He had entrusted that mission to his accountant Teodomiro Rangel. Neither did he supervise the revision thereof. Portilla seldom examined the statements of account which the defendant bank sent him personally, but when he did, it was only to determine whether there was a balance in his favor which might allow him to draw out. The majority of the statements remained in the plaintiff's desk at his office, unopened, until Rangel came to open and check them.

"This occasional and rather superficial examination, Portilla's absolute trust in Rangel, plaintiff's admitted lack of knowledge of bookkeeping, accounts for plaintiff's failure to notice the forged checks returned with his statements of account, if Portilla ever examined the balance of his account before Rangel had removed the forged checks, and undoubtedly it was this very occasional and rather superficial examination which prevented plaintiff from noticing, upon checking his statements to see whether all the drawn checks had been cashed, if he ever did check them, which we do not believe he did, that his statements of account revealed more charges than checks returned.

"Teodomiro Rangel covered up the forgeries by taking off the amount of the forged checks from the sales, that is, making entries in the books for smaller amounts than those deposited in the bank. In Portilla's checkbook, that is, in the stubs introduced as evidence, Rangel deducted from the former balance not only the amount of checks which appeared drawn according to the stubs, but also the amount of the forged checks. In this way he accommodated the balance of the statements of account with the balance of the check stubs. Had plaintiff made any examination before Rangel made such readjustments in the stubs for the purpose of determining the balance in his favor at the bank, he would have immediately discovered that the balance, according to the stubs, exceeded the balance shown in the statements of account in the amount of the forged checks. Such was the case, when Portilla personally, in spite of his admitted ignorance regarding bookkeeping, examined the stubs in his checkbook upon receiving notice from the bank that he was overdrawn. We can arrive at no other conclusion but that plaintiff never examined his checkbook in relation to

the balances reported by the bank in the monthly statements and that he only examined the bank statements for the purpose of determining whether the bank reported a balance in his favor which would allow him to draw against his current account.

"To cash the forged checks at the bank Rangel used the services of his brother-in-law Juan Bautista Iglesias. Rangel paid him cash every time he cashed a check. Iglesias cashed them without difficulty at the defendant bank. Most of the forged checks were paid at the defendant bank by the teller Fernando Conde; some were paid by the teller José Antonio Combas and others by different tellers of the bank. At no time did the tellers of the bank asked Iglesias to identify himself, since the checks were issued [to bearer]. When the tellers asked Iglesias to indorse the checks, he did so by signing Juan López Díaz or Juan I. Díaz. Combas, the only teller who knew Iglesias personally and knew his name, always cashed the checks without any indorsement. Neither the tellers nor Fernando Fernández, (bookkeeper) in charge of the account of A. Portilla & Co., ever had any doubts as to the legitimacy or genuineness of Portilla's signature in the checks that gave rise to plaintiff's claim.

"Rangel's and Iglesia's actions in connection with the forgery and the cashing of the checks were unknown to the officials and the employees of the defendant bank, nor did the evidence show that it was known to plaintiff, Ángel Portilla. Whenever the employees of the defendant bank gave plaintiff's statements of account to Rangel and to Iglesias, they did so because they knew of the relations existing between Portilla and his accountant, Teodomiro Rangel, and furthermore, because plaintiff never complained or made any claim.

"The fraud perpetrated by Rangel and his brother-in-law Iglesias was discovered around January 19, 1943, when the current account of A. Portilla & Co., in the defendant bank was overdrawn. When this happened, plaintiff was notified by telephone about the overdraft, and when he went to the bank he claimed that he had a balance in his favor of one thousand four hundred dollars ($1,400) or one thousand five hundred dollars ($1,500). From an examination made by plaintiff and Rafael Gilestra, employee of the bank, of plaintiff's stubs, for the month of December, 1942, it appeared from the stubs that there was a difference of over two thousand dollars in favor of Portilla, as compared with his bank account. Likewise,

from an examination of the checks cashed against the account of Portilla in the month of December, 1942, plaintiff pointed out four which he had neither drawn nor signed. Plaintiff immediately asked the firm of accountants of Gonzalo Aponte to examine his entire account and to determine the way in which Rangel covered up the fraud, as well as the amount paid by the bank in forged checks.

"It was necessary for plaintiff to obtain from the defendant bank the necessary papers in order to enable the accountants to make the investigation requested, since Portilla had destroyed most of the statements of account which the defendant bank had sent him during the years 1941, 1942 and 1943; he had destroyed most of the originals of the checks which he issued during those years, and Rangel had destroyed the forged checks. The defendant bank gave plaintiff a copy of all the statements of account corresponding to the afore-mentioned year and showed him and accountant José Díaz Santiago some of the forged checks in a system of photographs which defendant operated since May, 1941.

"At the time of the occurrences, the defendant bank had a system for training its tellers and for checking the signatures after the checks of all its depositors had been paid. Before being appointed to a cashier window all the tellers must go through a training period in various departments, especially in the current accounts department. The tellers, usually young men, begin as messengers or helpers in a department when they start to work in the defendant bank. Later, they are appointed to the current accounts department where checks are sorted for filing in the corresponding accounts and they work as book-keepers, entering deposits and crediting the checks paid in the accounts of the depositors. Even before working in the filing of checks, which is their first job in the department of current accounts, they spend some time learning to recognize the signature of the clients. They work as bookkeepers for a year or a year and a half before being promoted to tellers, as was the case of Fernando Conde and José Antonio Combas, who paid most of the forged checks the amount of which is claimed herein. In the filing of the checks as well as when they act as bookkeepers, the employees become familiar with and learn to recognize the signatures of the bank's clients. All the checks which are drawn against the current accounts pass through the hands of all the employees, filers, bookkeepers and

tellers; all of them have the duty of examining the signatures, and in case of doubt to refer to the files or consult the officials.

"The San Juan Branch of the Crédito y Ahorro Ponceño and the San Juan Branch of the Royal Bank of Canada, have in practice the same systems as the defendant bank.

"The first warning that the defendant bank had to the effect that forged checks were being paid against the account of A. Portilla & Co., was when plaintiff himself, on January 19, 1943, showed Rafael Gilestra, defendant's employee, four checks which he alleged he had not signed. After this date, the defendant bank did not pay any more forged checks drawn against the current account of the plaintiff."

As a basis for his judgment the trial judge set forth in brief the following conclusions of law:

1.—That the banks are required to know the signatures of their depositors and that they can only pay and charge to them, the checks which carry their legitimate signatures.

2. —That the relationship between a bank and a person who deposits money in a current account is that of debtor and creditor.

3.—That notwithstanding, in the relationship between a bank and its depositors there arise mutual obligations. The depositor has the inescapable duty of examining his statements of account and report to the bank any errors or irregularities within a reasonable term. Likewise, the depositor has the unavoidable duty of supervising the actions of his employees if those functions are entrusted to them.

4.—The obligation of the depositor of examining his statements of account and informing the bank about errors and irregularities is one of a legal nature, although there is no obligation of a contractual nature. It is a legal rule developed by usage and business practices and in the relationships between the banks and their depositors, advised by prudence and by a good sense of rectitude in commercial transactions.

5.—The term of 10 days, set forth in the statements of account sent by the bank to the plaintiff, is a reasonable term for the fulfillment of the obligation of examining them.

6.—The examination of the statements of account by the depositor should include: (a) checking of the cancelled checks with the stubs; (b) comparing the balance of the statements

with that of the depositor's books; and (*c*) checking the cancelled checks with the number of checks appearing from the statements of account.

7.—If the depositor makes a careful examination of his statements including checking and identification, and does not find any error or mistake, it must be presumed that he has been diligent in the fulfillment of his obligation. Contrariwise, if he fails to take these steps it must be presumed that he has been negligent in the fulfillment of his obligation.

8.—The appointment of reliable employees for the examination of the statements of account does not relieve the depositor from any further obligation. The depositor has the duty of supervising the action of his trusted employees when such activities or functions are delegated to the employees, and knowledge is imputed to the depositor, if not of the fraud of his employees or of any of them, at least of those errors, mistakes and irregularities which an honest employee would notice when examining the statements of account.

9.—The depositor who having had the opportunity of discovering that forged checks had been charged against his current account (or who having found out fails to notify the bank) is estopped from questioning the validity of any forged checks subsequently paid by the depositary bank, induced to do so by the negligent omission of the depositor of notifying the bank of the first forgeries.

10.—The depositor who having had the opportunity of discovering that forged checks have been paid against his current account, or who having found it out does not notify it to the bank, is negligent, and this negligence constitutes the proximate cause of any loss due to forged checks paid after the statements of account which contained the first forged checks of the series are sent.

11.—The defenses of negligence and estoppel may only be raised by the bank when it is free from negligence. Said negligence must be proved by acts and omissions which arise independently of the fact of the contractual violation because of the payment of the forged checks.

12.—In the instant case plaintiff's negligence consisted in his almost total disregard of the monthly statements of account sent by the bank and in his lack of supervision of the actions of his bookkeeper. Said negligence "constitutes the proximate cause of any loss due to forged checks paid after the remittance

of the statements of account which contained the first forged checks of the series. Plaintiff having had the opportunity to discover that forged checks had been charged against his current account and having failed to do so, is estopped from questioning the validity of any forged checks paid by the depositary bank subsequently, induced to do so by the negligent omission of the plaintiff of notifying the bank of the first forgeries."

13.—Since this is an action based on checks, plaintiff's claim is barred as to all checks paid more than three years before the extra-judicial claim made by the plaintiff to the bank on May 11, 1943.

On appeal, plaintiff assigns the commission of the following errors:

"1.—The lower court erred in holding that plaintiff-appellant was guilty of negligence when, having had the opportunity to discover that forged checks had been charged against his current account, or having detected it, failed to notify it to the bank, and that said negligence was the proximate cause of the loss due to the forged checks paid by the bank.

"2.—Even assuming that plaintiff was guilty of negligence in failing to detect the forgeries and in notifying the bank, the lower court erred in not holding that the defendant bank was guilty of negligence towards plaintiff, and that it was incumbent on said bank to prove, by way of an affirmative defense, that it was totally free from negligence before raising the question of plaintiff's negligence.

"3.—The lower court erred in holding, as a matter of law, that the depositor of a bank is bound to supervise the actions of his employees in examining his statements of account if those functions are delegated to them.

"4.—The lower court erred in holding, as a matter of law, that the depositor who having had the opportunity to discover that forged checks had been charged against his current account, does not notify the bank, is estopped from questioning the validity of any of the forged checks paid subsequently by the bank.

"5.—The lower court erred in holding that plaintiff's claim is barred as to all the forged checks paid more than three years before the extrajudicial notice served by appellant on the appellee on May 11, 1943.

"6.—The lower court erred in imposing on plaintiff the attorney's fees of the defendant; and even assuming that it was justified in so doing, the amount of one thousand dollars assigned for said purpose is excessive and exaggerated, all of which constitutes a clear abuse of discretion."

■ Before discussing the errors assigned, it is necessary to determine the nature of the relationship or juridical bond which arises between a bank and a depositor. Our Banking Act does not define that relationship, since it limits itself to the regulation of the legal administrative aspect of the banks, as to its organic requirements and the standards of public policy by which they shall be regulated, omitting contracts and their private relations. Garrigues, *Tratado de Derecho Mercantil*, Vol. I, p. 87. But our Civil Code characterizes the contract involved in the establishment of a current account as a loan, and not merely as a deposit, since the depositary bank has, besides its obligation of keeping and restoring the money deposited, or its value, the authority of using or disposing of the thing deposited. Sections 1631 and 1668 of the Civil Code; § 227 of the Code of Commerce; *Treasurer* v. *Banco Comercial*, 46 P.R.R. 298; 2 Benito, *Derecho Mercantil*, p. 464 *et seq;* Manresa, *Comentarios al Código Civil*, Vol. 11, p. 687, 5th ed.; Castán, *Derecho Civil Español*, pp. 303, 304; 3 Valverde, *Tratado de Derecho Civil Español*, p. 528, 3d ed.; Planiol y Ripert, *Tratado Práctico Español*, p. 528, 3d ed.; Planiol y Ripert, *Tratado Práctico de Derecho Civil Francés*, Vol. 11, pp. 452–453: "The depositor loses the ownership of the amounts deposited; there is no longer, as is the case of a real deposit, a right to revendicate the object deposited, but merely a right of credit against the depositary, as in the case of a loan for consumption"; 4 Colin y Capitant, *Curso Elemental de Derecho Civil*, p. 550; Judgment of the Supreme Court of Spain of November 24, 1943, the opinion having been written by the learned commentator Castán. The same opinion has been followed in Philippines, applying Sections of the Code of Commerce identical with

§ § 227 and 228 of our Code: *In re Liquidation of the Mercantile Bank of China*, 65 Philippine 443, 451. To regard such a relation as one which gives rise to a loan contract is in harmony with the prevailing rule in the United States of identifying said relation as one of debtor and creditor. *Treasurer* v. *Banco Comercial, supra;* Michie, Banks and Banking, Vol. 5 A, chapter 9, § 1, p. 1 *et seq;* Gay de Montellá, *Comentarios al Código de Comercio*, Vol. 2, p. 393; *Gullas* v. *Banco Nacional*, 62 *Jurisprudencia Filipina* 558, 561; *San Carlos Milling Co.* v. *Banco de las I. F.*, 59 *Jurisprudencia Filipina* 62.

 The depositary bank is bound to pay to the depositor the debt which may result from the loan involved. Under § 1116 of our Civil Code, applicable to the contract in issue, the defendant bank in the case at bar was bound to pay to the creditor or depositor or to the person duly authorized by him to receive the money. The bank was bound by contract to charge against the depositor's account only those payments made under the true and authentic signature of the depositor, that is, to the depositor himself or to the person authorized by the latter to receive it. This rule coincides with the principle adopted by the United States courts. *American Sash & Door Co.* v. *Commerce Trust Co.*, 56 S. W. 2d 1034; *First Nat. Bank of Weslaco* v. *Patty*, 62 S. W. 2d 629; *Defiance Lumber Co.* v. *Bank of California*, 41 P. 2d 135. A bank is charged with knowledge of the depositor's signature and, when it pays a forged check, the payment is not made because of the depositor's valid order. *Herbel* v. *People's State Bank of Ellinwood*, 228 P. 2d 929; *Bank. of New York* v. *Public Nat. Bank*, 92 N.Y.S. 2d 620; *Interstate Hosiery Mills* v. *First Nat. Bank*, 11 A. 2d 537.

In the judgment of the Supreme Court of Spain of February 28, 1896, it is held that § 1162 of the Civil Code of Spain, corresponding to § 1116 of ours, "imposes on the debtor, which in this case is the defendant bank, the obliga-

tion to pay the check to the depositor himself, to the creditor or to any other person authorized to receive it in his name, which obligation is not extinguished if the payment is made to an unauthorized third party." See also, Manresa *op. cit.*, Vol. 8, p. 536.

However, as we have seen, we are concerned here with the performance by the bank of a contractual obligation of paying or restoring what was given as a loan. The breach of that obligation may bring about legal consequences without showing that the bank has been negligent. The situation is not governed by concepts of negligence, that is, of extra contractual breach, since the bank's obligation stems from the loan contract itself. There may be cases, like the one at bar, in which the forgery has been made with such a degree of skill and excellence (or of accurate supremacy) that it might not have been detected by the bank or its employees, no matter how diligent or reasonably careful they might have been. Naturally, the "most accurate checking" (*Cf.* Judgment of the Supreme Court of Spain of December 4, 1906), practiced by exceptional experts would have resulted in the discovery of the forgery, but the principles of negligence are not based on standards of quasi perfection, but rather on a pattern of reasonableness. The fact in itself of absence of negligence, that is, that the bank through its agents or employees, adopted every reasonable precaution and acted with diligence and reasonable care as to verifying the signature, although uneffectively, does not exonerate it from liability if it has paid a forged check. In that case the bank has not fulfilled its contractual duty of making the payment to a person authorized by the depositor, and that limits the bounds of a bank's liability, independently of the concepts of negligence.[1]

---

[1] In some cases the Supreme Court of Spain has suggested that a bank's liability may be based on concepts of negligence. See Judgments of February 3, 1927 and December 4, 1906. From the above stated, we believe it is the case of a contractual obligation not based in fault or in negligence.

■ In its essence this suit refers to the conclusion reached by the trial court to the effect that the payment by the bank of the forged checks was due to the very conduct or negligent omission of the depositor plaintiff, in failing to adequately control and supervise the conduct of his employee Teodomiro Rangel, the forger, and in failing to check, inspect, or discover the bank statements and cancelled checks sent monthly by the bank to the depositor, as well as in failing to report to the bank, for a period of three years, about one hundred seventy-one checks which involved the amount of $26,139.39. Portilla, during that period of time, never examined personally the cancelled checks nor the bank statements, limiting himself, on very rare occasions, to determine whether there was any balance to his favor. Most of the time, Portilla did not even open the envelope containing the statements and the cancelled checks. According to the conclusions of the trial court, Rangel covered up the forgeries by taking off the amount of the forged checks from the sales, that is, making entries in the books for smaller amounts than the ones deposited in the bank. Portilla never examined his own books nor verified the progress of the sales, insofar as it might imply discovering the forgeries. In the stubs of the checkbooks Rangel deducted from the former balance not only the amount of the checks which appeared drawn according to the stubs, but also the amount of the forged checks. In that way the balance of the statements of account agreed with the balance of the stubs. As the trial court concluded, "had plaintiff made any examination before Rangel made such readjustments in the stubs for the purpose of determining the balance in his favor at the bank, he would have immediately discovered that the balance, according to the stubs, exceeded the balance shown in the statements of account in the amount of the forged checks." But Portilla never took it upon himself, in three years, to make personally such verifications. He entrusted everything to Rangel, the forger himself. It shows an extra-

ordinary lack of care on the part of Portilla, an indifference almost touching on absolute inertia, a gross unconcern for his own economic matters, and for the vigilance of his employees, which made Portilla immune to his economic situation, and to the conduct of his agents, not exactly because of incompetence or deliberate standards of stoicism, but because of his excessive confidence in Teodomiro Rangel. It all shows a gross negligence on the part of Portilla, which opened an easy way to the perpetration of the fraud. As held by the Supreme Court of Spain in its judgments of December 4, 1906 and of February 28, 1896, under analogous circumstances (payment by a bank of forged checks), the depositor may not recover from the bank under such circumstances if he is guilty of omission or negligence which facilitated the fraud or if the payments were made through the depositor's fault, in which case he is held liable. The passiveness and silence of the depositor in the case at bar, and his lack of vigilance over Rangel, that is, the depositor's negligence, was an effective and predominant cause contributing to the bank's conduct in paying the forged checks. Let us examine the legal rules applicable herein.

■■ Section 24 of the Negotiable Instruments Act of Puerto Rico (§ 376 of the Code of Commerce, and which corresponds to § 23 of the Uniform Negotiable Instruments Act, Sess. Laws p. 172), provides as follows:

"When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority."

Under the text cited, a bank shall acquire no right against a depositor when it has paid a check in which the latter's signature has been forged, unless the depositor is "precluded

from setting up the forgery or want of authority." See the lengthy annotation in 146 A.L.R. 840. The Negotiable Instruments Act does not define the circumstances under which said impediment may arise, but the word "precluded" used in § 24 has been construed as identified with the concept of "estoppel." *Union Trust Co.* v. *Soble,* 64 A. 2d 744; *Citizens Union Nat. Bank* v. *Terrell,* 50 S. W. 2d 60; .*National Deposit Bank of Owensboro* v. *Ohio Oil Co.,* 62 S. W. 2d 1048; *Scott* v. *First National Bank in St. Louis,* 119 S. W. 2d 929. The United States courts have recognized various circumstances in which a person may be precluded from raising as a defense the forgery of his signature in a negotiable instrument. For example, when he has admitted the genuineness of the signature or of his responsibility under the instrument. *Marsh* v. *State Bank & Trust Co.,* 284 S. W. 380; *Negim* v. *First State Bank of Picher,* 49 P. 2d 763; *Horn* v. *Nicholas,* 201 S. W. 756. To the same effect is a promise to pay with full knowledge of the forgery, (48 A.L.R. 1370) or when there is an adoption of the forged signature (48 A.L.R. 1374). Estoppel also arises when the benefits of the payment of the document are received, in spite of the forgery. *Embry* v. *Long,* 75 S. W. 2d 1036. Silence or any unreasonable delay in giving notice of the forgery, once discovered, (25 A.L.R. 177 and 50 A.L.R. 1374) has been also admitted as a cause of estoppel in this sense. Likewise, putting in circulation the document, (*Weyauwega* v. *Ayling,* 99 U. S. 112) or renewing the same (*First State Bank* v. *Williams,* 121 N. W. 702; 35 A.L.R. 1282; 72 A.L.R. 604, 609) has the same effect. Finally, a person who through negligence puts in circulation a negotiable instrument is held liable. *Northern P. R. Co.* v. *Spokane Valley Growers Union,* 232 Pac. 691.

The American courts have applied the doctrine of estoppel in these cases, the majority view being that when a bank pays checks in which the depositor's signature has been forged, the loss must be suffered by the depositor if he has

been negligent in the discovery or in notifying the bank of the forgery. Michie, *op. cit.* Vol. 5b, § 283, p. 121. This concept of negligence is based on the implied duty of the depositor of examining the bank statements which are periodically sent to him; likewise he should report, within a reasonable term, any fact which he discovers showing that his signature has been forged. 60 Harv. L. Rev. 643; *Leather Manufacturers Nat. Bank* v. *Morgan*, 117 U. S. 96, 29 L. ed. 811; *First Nat. Bank* v. *Farrell*, 272 Fed. 371; *Takenaka* v. *Bankers Trust Co.*, 132 Misc. Rep. 322; *Worthen Bank & Trust Co.* v. *Kelley-Nelson Const. Co.*, 245 S. W. 2d 405; *Herbel* v. *People's State Bank*, *supra*.

■ The failure of a depositor to notify the bank of any improper charges, because he has not examined his returned vouchers, constitutes a defense for the bank. *Maryland Casualty Co.* v. *Central Trust Co.*, 51 N.Y.S. 2d 65; *Screenland Magazine Inc.* v. *National City Bank of New York*, 42 N.Y.S. 2d 286; *Basch* v. *Bank of America Nat. Trust & Savings Assn.*, 139 P. 2d 1; *Morgan* v. *United States Mortgage & Trust Co.*, 101 N. E. 871. As to a series of forgeries, there is a causal relation between the omission of examining the bank statements and the payment of those checks, since the discovery of the fraud would have placed the bank in a position to avoid the subsequent payment of forged checks, and the bank would have been "on guard" against future attempts to collect forged checks. *Critten* v. *Chemical National Bank*, 63 N. E. 969; *Israel* v. *State Nat. Bank*, 50 So. 783; Arant, Forged Checks—*The Duty of the Depositor to his Bank*, 31 Yale L. J. 598, 623. Under said circumstances and as result of the depositor's silence and his failure to act the bank has been induced to pay. *First Nat. Bank* v. *Allen*, 14 So. 335, 338. See also *Worthen Bank & Trust Co.* v. *Kelley-Nelson Const. Co.*, *supra;* *Interstate* v. *Soble*, *supra*. See also, on this subject, 4 Williston *on Contracts*, rev. ed., § 1145, p. 3292 and annotations in 15

A.L.R. 159; 67 A.L.R. 1121; 103 A.L.R. 1147.

 As to contracts in general, the prevailing rule in the United States is to the effect that non-fulfillment may be excused by that conduct or lack of action on the part of the creditor which is tantamount to equitable estoppel. 31 C.J.S. 439, § 151; Pomeroy's *Equity Jurisprudence*, Vol. 3, p. 208, § 808 a; *cf.* Corbin *on Contracts*, Vol. 3, p. 913, § 754.

 In the United States three doctrines have been set forth as basis for exonerating the banks when the payment to the forger has been induced by the negligent enaction of the depositor. The three doctrines flow from the common assumption of the obligation of the depositor of examining the bank statements and the vouchers returned by the bank. They are: that of estoppel based on negligence which we have already discussed, that of ratification or adoption and that of liability based upon an implied contract. As to the concept of ratification it has been stated by some courts and commentators that the subsequent silence of the depositor may amount to an implied ratification of the forgery. Britton, *on Bills and Notes*, p. 597; Brannan's *Negotiable Instrument Law*, p. 336. Said doctrine has been criticized since the forger has not even acted with the apparent authority of the depositor, his action not being subject to ratification. Williston, *On Contracts*, § 1145, p. 3290–91, rev. ed.; *cf. No Dust O Co.* v. *Home Trust Co.*, 46 S. W. 2d 203; *Magid* v. *Drexel Nat. Bank*, 71 N. E. 2d 898; *Fourth & Central Trust Co.* v. *Johnson*, 156 N. E. 462; *First Nat. Bank* v. *Allen, supra;* and see the Annotation in 150 A.L.R. 978. We must note that under this doctrine the basis for implying a ratification is the implied knowledge, and this is an anomalous basis for the bank's exoneration, even if it works out a just result. Arant, *Forged Checks—Duty of the Depositor to his Bank*, 31 Yale L. J. 598.

As to which should be the prevalent legal doctrine in Puerto Rico with respect to the consequences of the depositor's conduct in failing to examine or check the statements

of account sent to him, it is undeniable that the depositor does not have the express contractual duty to examine such statements of account, since he did not expressly assume that obligation. However, from a realistic and functional point of view, the stability in the banking relations and the immanent principles of justice and reasonableness imposes on the depositor the duty to examine and check such bank statements since the depositor has consistently the opportunity of preventing the bank from repeatedly assuming the risks of continued forgeries. Said duty on the part of the depositor has not been contractually set up in an express manner or in any specific statutory provision. But from the point of view of the equitable doctrine which in the absence of law is applicable, from the point of view of reality, usage and customs prevailing in the relation of bank and client, the depositor is under an implied contractual duty of conducting an examination and verification and due to the commercial and banking practices and the customs prevailing in the community they may create implied contractual duties which may be considered as a tacit part of the contract. According to § 2 of our Code of Commerce, commercial transactions shall be governed by the provisions contained in the same; in the absence of such provisions by the commercial customs generally observed in each place, and in the absence of both, by those of the common law.

In Garrigues, *op. cit.*, Vol. 1, p. 143, the importance of usage in the commercial relationships is set up as follows:

"Historically, usage has the first rank in the sources of Mercantile Law. In the Middle Ages commercial trade was predominantly regulated by usages compiled in the Statutes of the Corporations. At all times the commercial legislation has been in its majority a compilation and revision of customs. Section 20 of the Regulation of February 8, 1927 imposed on the Superior Banking Council the obligation of adopting the customs and commercial usages for the purposes of § 2 of our Code of Commerce. And pursuant to § 8 of the Regulation of the Chamber of Commerce of July 26, 1929 these bodies must

necessarily be heard on the usage and trading practices in the places of their territory.

"The growth of Mercantile Law, as a special deviation of the Civil Law, explains the importance of usage. When the civil law did not adapt itself to the peculiar demands of the commercial trade, the merchants did not remain idle, waiting for an adequate legal regulation, but they immediately departed from the application of the law by way of extra legem usages, which were suitable to their special economic purposes. Mercantile Law is not born legislatively but by the force of usage. The rapid course of commerce demanded a rather elastic Code pliable to the slightest turn of everchanging needs; a dynamic law, alive in the practice; not a static law, dead in the Codes. The Commercial usage is manifested, therefore, as the reaction of the merchants against the application of the Civil Law in those commercial contracts which also had their corresponding civil regulation. On the other hand, in the genuinely commercial institutions (bills of exchange, commercial partnership, insurances, current accounts, mediation, maritime contracts ... ) it was the commercial usage which regulated them in their form and in their effect, modifying and adapting, according to the needs of commerce, the traditional principles of the Civil Law. From here emerges the rule, which is still extant in § 2 of our Code of Commerce, that the custom and usage of the merchants should prevail over the Common Law."

Usage is that juridical rule spontaneously developed in the life of commerce and applied in a general uninterrupted and persistent way, on the basis of need and kindness, the need being based on the absence of a specific law, and the kindness, on the commercial usefulness and justice of the usage. Benito, *op cit.*, pp. 239, 240 *et seq.* Usages should be observed in practice as rules of law. Gay de Montellá, *op. cit.*, p. 24. As to contracts, usage is suppletory and serves to interpret ambiguous clauses or to supply those omitted if they are necessary to execute the contract. Benito, *op. cit.*, p. 250.

This Court takes judicial notice of the practice of the banks of sending monthly statements and cancelled checks to its depositors. See the annotation: *Judicial No-*

*tice of Banking Customs*, 89 A.L.R. 1336, 1354 and see also 8 A.L.R. 2d 446 and *Morgan* v. *U. S. Mortgage & Trust Co.*, *supra*. We consider that said practice must have a real and effective purpose, which is that the documents be examined and checked by the depositor, for the purpose of reporting to the bank any possible irregularity. As a matter of fact, it is commonly known that a bank has to carry on continuously a multiplicity of operations for the cashing of checks. "An accurate checking with exceptional experts" in each check is not practicable. It is reasonable, and within the mercantile possibilities, that a bank should attempt protection against errors in which there is no negligence by sending the statements of accounts and cancelled checks to the depositors for their examination and verification. It would not be fair and reasonable for a bank to assume the whole risk as to the payment of forged checks, which result from errors which may be natural in the ordinary course of business due precisely to the multiplicity of banking operations. Hence, the need and the kindness of sending the bank statements to be examined and checked for the purposes of "executing the contract," that is, in order that the bank be apt to make the payments to the depositor or to the person duly authorized by him. Hence, also the equity involved in the matter, which determines the creation of an implied contractual duty of the depositor to examine the statements of account and to inform the bank of any possible irregularity. The depositor should cooperate in the discovery of the fraud. He has had the opportunity of putting an end to the continuous forgery, and he should have used that opportunity.

The Courts of Great Britain have established a rule contrary to the one prevailing in the United States and to the one which we are adopting herein. In the cases decided by the King's Bench Division, *Lewis Sanitary Steam Laundry Co.* v. *Barclay & Co.*, (1906); *The Kepitigalla Rubber Estates, Ltd.* v. *The National Bank of India*, (1909) and *Walker* v. *Manchester & Liverpool District Bank*, (1913),

it was held that in cases of forgery of checks, it is not the duty of the client to avoid future forgeries or to examine the documents sent periodically by the bank, the doctrine of estoppel by negligence not being, therefore, applicable and that, furthermore, the omission of the depositor to examine said documents and to report to the bank was not an effective and affirmative cause of future forgeries, but at most, served as a passive cause or condition, even if *sine qua non*, of said subsequent forgeries. We do not agree with the learned British Court. We have already stated the reasons why, in our opinion, it is the duty of the depositor to examine and check the statements of account and the forged checks sent by the bank. As to the problem of cause, under our civil law, an omission may be a cause for liability. Silence or inaction may give rise to an estoppel. The omissions of the depositor in the case at bar served as an effective cause to induce the bank to continue cashing forged checks, since the bank was never put on guard as to the continued irregularities. *Goldsmith* v. *Atlantic Nat. Bank of West Palm Beach*, 55 So. 2d 804; *Foutch* v. *Alexandria Bank & Trust Co.*, 149 S. W. 2d 76.

In brief, the usages and banking customs impose on the depositor the implied contractual duty and the liability in equity of examining and checking the statements of account and cancelled checks sent to him monthly by the bank. In the case at bar the breach by the depositor of that duty was the effective and predominant cause of the uninterrupted and repeated payment of the forged checks, and the depositor may not demand from the bank the amounts thus paid, since such payments were made because of the conduct of the depositor himself when he failed to perform his implied contract obligation.

However, three checks were forged during the first month of the period of time involved in this suit, that is, during the month of January, 1940, which amounted to $630.68, said forgeries being made before the first state-

ment of account was sent to the depositor. The doctrine above stated is not applicable as to those checks since the bank was not induced by an act or omission on the part of the plaintiff to pay those checks and the three checks have no connection whatsoever with the breach by the depositor of his implied contractual duty to examine the bank statements. Such result as to the checks paid during the first month coincides with the majority rule prevailing in the United States. Britton, *op. cit.*, p. 599; Woodward, *The Risk of Forgery or Alteration of Negotiable Instruments*, 24 Col. L. Rev. 469, 471.

The defendant bank, invoking the provisions of § 946 of the Code of Commerce, raised the defense of prescription in the trial court with respect to the checks paid prior to May 1, 1940, which allegation includes the checks paid in January, 1940 amounting to $630.68. The trial court concluded that the action as to those checks had prescribed. Plaintiff has assigned this conclusion as error. We find it necessary to pass on this assignment in view of our conclusion that the bank is under obligation to pay said $630.68 to the depositor.

Section 946 of our Code of Commerce provides as follows:

"Actions arising from drafts shall extinguish three years after maturity, whether such drafts have been protested or not.

"A similar rule shall be applied to commercial bills of exchange and promissory notes, checks, stubs and other instruments of draft or exchange and to coupons and amounts for the redemption of obligations issued in accordance with this Code."

However, plaintiff's claim against the bank in the case at bar does not issue from grants or from drafts or bills of exchange. It does not arise from checks and it is not even based on forged checks, nor is it an action for damages based on the fact that the checks were forged. The action is a general one for collection of money, based on the current account in the bank, that is, as we have seen, it is a loan

contract with the bank, from which there arises the relationship of creditor and debtor. It is a question of collecting the payment of a debt and of a personal obligation under the aforesaid Sections of the Civil Code. Therefore, § 946 of the Code of Commerce is not applicable.

Construing § 950 of the Spanish Code of Commerce which corresponds to § 946 of our Code, Gay de Montellá in his work on the Code of Commerce, Vol. 5, pp. 503–504, states the following:

"But a distinction must be made as regards the aim of prescription. The three-year prescription bars actions arising from negotiable instruments, but not actions arising from the fundamental juridical relations which the contracting parties have sought to identify with the actions on negotiable instruments. If a loan is guaranteed by a negotiable instrument, the actions derived from the relations arising from the latter shall prescribe, but the right of action arising from the mutual contract shall remain intact and shall survive for its entire term."

In the judgment of the Supreme Court of Spain of November 17, 1925, cited in Gay de Montellá, *op cit.*, Vol. 5, p. 502, the following is stated:

"Upon the *Audiencia* declaring in the judgment appealed from that the promissory note presented with the complaint is not included in the effects of the prescription of the action filed pursuant to the provisions of § 950 of the Code of Commerce, because the claim is not based solely and exclusively on the note, but as issuing from and representing another contract which was sought to be secured and guaranteed by the promissory note, it did not commit an error of law in weighing the hearsay evidence and it confined itself to the terms of the complaint in which the payment of the amount sued on is claimed as a reimbursement of a loan set forth in the different policies representing the current accounts open to defendants and reduced to a fixed obligation payable, precisely two months after the interested party is notified, by virtue of the authority granted under one of the conditions of the policy entered for each current account to the plaintiff bank. (J. November 17, 1925.)"

In the judgment of October 29, 1914, of that some court it is stated, with respect to the aforesaid Section:

"...it is not the three-year prescription but the ordinary prescription provided by § 1.964 of the Civil Code, which applies, if the action is based on a document which guarantees to the defendant as a surety, that the amount was certain although the debtor owed said sum in loans in which in order to obtain the sum loaned it was necessary to discount the bills of exchange."

In the judgment of said court of May 24, 1928, the following was stated:

"The provisions of § 950 (§ 946 of our Code of Commerce) are inapposite if the amounts become items of a current account contract agreed to by the parties."

Therefore, since the aforesaid § 946 is inapplicable we would have to apply § 940 of that same Code of Commerce which provides that "the actions which by virtue of this Code do not have a fixed period in which they must be brought, shall be governed by the provisions of the common law." In the absence of a fixed period, the action herein shall prescribe after 15 years, under § 1864 of our Civil Code.

The action has not prescribed in the instant case and the error assigned was committed as to the aforesaid sum of $630.68 to which plaintiff is entitled.

■ Now then, from the very discussion which we have developed as to the legal principles applicable it appears that there was no obstinacy on the part of the depositor upon filing his claim. Therefore, the trial court erred in ordering plaintiff to pay attorney's fees. The other errors assigned by appellant were not committed.

The judgment appealed from shall be modified by ordering defendant to pay plaintiff the amount of $630.68 with the corresponding interest and by eliminating from the judgment that part which refers to the payment of attorney's

fees, the case being remanded to the trial court for further proceedings not inconsistent with this opinion.

Mr. Justice Sifre and Mr. Justice Belaval did not participate herein.